AMERICAN BROADCASTING CO., Inc. v.
FEDERAL COMMUNICATIONS COM-
MISSION et al.

No. 9760.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 23, 1948.

Decided Oct. 17, 1949.

Mr. James A. McKenna, Jr., Washington, D. C., with whom Mr. Andrew G. Haley, Washington, D. C., who entered an appearance, and Mr. Joseph A. McDonald, New York City, were on the brief, for appellant. Mr. Vernon L. Wilkinson also entered an appearance for appellant.

Mr. Max Goldman, Acting Assistant General Counsel, Federal Communications Commission, with whom Mr. Benedict P. Cottone, General Counsel, who entered an appearance, and Mr. Richard A. Solomon and Miss Mary Jane Morris, Counsel, Federal Communications Commission, were on the brief, for appellee. Mr. Harry M. Plotkin, Assistant General Counsel, Federal Communications Commission, also entered an appearance for appellee.

Mr. Roy Hofheinz, Houston, Tex., of the Bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, with whom Mr. Leonard H. Marks, Washington, D. C., who entered an appearance, and Mr. John Erle Stephen, Houston, Tex., were on the brief, for intervenor Texas Star Broadcasting Company. Mr. Marcus Cohn, Washington, D. C., also entered an appearance for intervenor Texas Star Broadcasting Company.

Mr. Marcus Cohn, Washington, D. C., entered an appearance for intervenors Max H. Jacobs, Douglas Hicks and Tom J. Harling, d/b as Veterans' Broadcasting Company.

Before STEPHENS, Chief Judge, and WILBUR K. MILLER and PROCTOR, Circuit Judges.

STEPHENS, Chief Judge.

Prior to May 9, 1947, the intervenor, Texas Star Broadcasting Company, hereafter referred to as Texas Star, was licensed by the Federal Communications Commission, hereafter referred to as the Commission, to operate radio station KTHT at Houston, Texas, on a frequency of 1230 kilocycles, 250 watts power, unlimited time. On May 9, 1947, the Commission granted to Texas Star a construction permit to change the KTHT frequency to 790 kilocycles and to increase its power to 5000 watts daytime, 1000 watts nighttime, with a directional antenna at night.[1] By this grant KTHT was authorized to increase its daytime service to the Houston metropolitan area and contiguous rural areas so as to reach some 548,000 additional persons (more than double the number being served at the time of the grant), to enlarge its service area by 24,000 square miles (6½ times), and to increase its nighttime service area so as to serve some 128,000 additional persons and 121 square miles (30% and 22% gains respectively). This grant caused no interference to existing or proposed stations. On August 21, 1947, however, the Commission, pursuant to an application filed on July 3, 1947, granted Texas Star a further authorization, to wit, to

---

1. The date of the granting of the construction permit to Texas Star is given as May 9, 1947, in the American Broadcasting Company's petition for reconsideration referred to in the text. In the opposition thereto of Texas Star, the date is given as May 19, 1947. It is immaterial to the questions on this appeal whether the permit was issued on May 9 or May 19.

modify the KTHT construction permit by an increase of nighttime power to 5000 watts and to make a change in the transmitter location and in the installation of antenna arrays for both night and day operation. This grant was made upon the written submission of the application of Texas Star, that is to say, without an oral hearing before the Commission.

The appellant, American Broadcasting Company, Inc., hereafter referred to as American, is licensed to operate radio station KECA at Los Angeles, California, on a frequency of 790 kilocycles, 5000 watts power, unlimited time, with a directional antenna at night. It is a Class III-A station, and is as such licensed to operate within a "normally protected contour" of 2.5 mv/m. Its "established service area," however, extends to a contour of 1.83 mv/m.[2] Within the time allowed by Section 405 of the Communications Act of 1934, 47 U.S.C. §§ 151 et seq. (1946), hereafter referred to as the Communications Act, and by the Rules and Regulations of the Commission, Part 1, § 1.390, American filed a petition, together with a supporting engineering affidavit, for reconsideration of the grant of August 21, 1947, to Texas Star. The petition and affidavit asserted that the operation of KTHT under the grant of August 21, 1947, will by interference increase the nighttime limitation to KECA

from 1.83 mv/m to 2.46 mv/m and cause a loss to KECA of 23% of its service area and 153,644 listeners (a 5.2% population loss); that the interference will lie in the general Los Angeles area; that although the service area in question is presently served by six other broadcasting stations, none of them carries the same general program service as that of KECA. American later filed a supplemental petition and supporting engineering affidavit submitting to the Commission a proposed revised directional antenna system for KTHT, which, it was asserted, would serve substantially the same areas and population as would be served by the antenna system authorized by the grant of August 21, 1947, for KTHT (1190 square miles as compared with 1248 square miles; 579,357 persons as compared with 574,064 persons), and would protect the service area of KECA and the service areas of all existing or proposed co-channel and adjacent channel stations. By its petition and supplemental petition and the supporting affidavits, American sought favorable action by the Commission under that provision of Section 1 of the Commission's Standards of Good Engineering Practice Concerning Standard Broadcast Stations, effective August 1, 1939 (revised to October 30, 1947), page 3, reading as follows:

When it is shown that primary service is rendered by any of the above classes of stations,[3] beyond the normally protected con-

2. In the opposition filed by Texas Star to the petition for reconsideration of American it is asserted that station KECA is a Class II station. This is apparently an error, since the Rules and Regulations of the Commission assign a frequency of 790 kilocycles to Class III-A and III-B stations but not to Class II stations. See the rules and regulations of the Commission, Part 3, §§ 3.25 and 3.26. But the discrepancy is immaterial, since the normally protected contour of both Class II and Class III stations is 2.5 mv/m.

3. The reference in the quoted provision is to the four classes of standard broadcasting stations established by the Standards of Good Engineering Practice referred to in the text, to wit: Class I (clear channel stations operating with powers not less than 10 or more than 50 kilowatts): Class II (clear channel sta-

tions operating with powers not less than 0.25 kilowatt or more than 50 kilowatts); Class III stations (operating on regional channels and normally rendering primary service to the metropolitan district and the rural area contained therein and contiguous thereto, and subdivided into (a) Class III-A stations, operating with powers not less than 1 kilowatt or more than 5 kilowatts, and normally protected to the 2.5 mv/m ground wave contour nighttime and the 0.5 mv/m ground wave contour daytime; and (b) Class III-B stations, operating with powers not less than 0.5 kilowatt or more than 1 kilowatt nighttime and 5 kilowatts daytime, and normally protected to the 4.0 mv/m ground wave contour nighttime and the 0.5 mv/m ground wave contour daytime); and Class IV stations (operating on local channels normally rendering primary service only to a city or town and the suburban and rural areas contiguous

tour, and when primary service to approximately 90 percent of the population (population served with adequate signal) of the area between the normally protected contour and the contour to which such station actually serves, is not supplied by any other station or stations carrying the same general program service, the contour to which protection may be afforded in such cases will be determined from the individual merits of the case under consideration.

Hereafter for convenience this provision is referred to as the individual merit standard. American's petition and supplemental petition prayed that the Commission set aside the August 21, 1947, grant to Texas Star, designate for hearing Texas Star's application for this grant, make American a party to the hearing, and include an issue as to whether KTHT could operate with 5000 watts power at nighttime and employ a directional antenna such as would afford protection to the present service area of KECA and other co-channel stations. In brief, American sought a hearing in which it might show to the Commission before final action on the application of Texas Star the extent and seriousness as alleged of the loss to the KECA service area as a result of the operation of KTHT if the grant of August 21, 1947, were to be made final, and in which it might aid the Commission in determining whether or not the public interest, convenience and necessity would best be served by the operation of KTHT under the grant of August 21, 1947, or by its operation in such manner as to protect the service area of KECA.

To these petitions of American, Texas Star filed an opposition supported by an engineering affidavit. This opposition controverted the allegation of American that the proposed operation of KTHT would cause loss to KECA of 153,644 listeners, alleging that only 77,410 resided in the claimed area of interference compared with 128,642 additional persons who would receive service in the Houston area under the proposed operation of KTHT. The opposition controverted also the allegation of American that the interference to be occasioned would lie in the general Los Angeles area, asserting to the contrary that the nearest point in the interference area would be 22 miles from Los Angeles, and some points as much as 48 miles distant. The opposition further controverted the assertion of American that none of the six stations other than KECA serving the area in question carries the same general program service as that furnished by KECA, alleging to the contrary that the area of claimed interference is served by six stations other than KECA, to wit, four Los Angeles stations, two of which are national network affiliates, and two other stations, and that these stations furnish the same general type of program service as KECA. The opposition of Texas Star further asserted that since the Commission's order of August 21, 1947, granting the application for modification of its construction permit, Texas Star had made substantial expenditures upon the faith of this grant; that a grant of American's petitions would cause irremediable and unjustifiable damage to Texas Star; that American's proposed directional antenna system for KTHT would seriously limit that station's service in one of the most populous districts in the Houston metropolitan area, would require additional land possibly unobtainable even at increased price (since purchase of a transmitter under the August 21 grant), and would require added expense for two additional towers with phasing equipment. The opposition of Texas Star still further asserted that Section II, B, paragraph 6 of the North American Regional Broadcasting Agreement, Havana, 1937, 55 Stat. (Pt. 2) 1005, designates 790 kilocycles as a regional channel; that stations such as KECA are protected by that Agreement to the 2.5 mv/m contour; that under the Agreement a foreign assignment could be made on the 790 kilocycles channel which would limit KECA to its 2.5 mv/m contour; and that in determining the equities urged by American, this should be considered. Finally, the opposition of Texas Star asserted that § 1.390 of the Commission's Rules and Regulations limits petitions

thereto, with powers not less than 0.1 kilowatt or more than 0.25 kilowatt, and normally protected to 0.5 mv/m

ground wave contour daytime). As stated in the text, American is a Class III-A regional station.

for reconsideration to those wherein it is alleged that interference would be suffered by the petitioner within its normally protected contour, and does not contemplate rehearings upon petitions such as those of American which allege that interference will be occasioned in the service area beyond the normally protected contour.

On January 8, 1948, the Commission in a memorandum opinion and order denied American's petitions for reconsideration. American then appealed to this court under Section 402(b) (2) of the Communications Act.

On this appeal American contends that under the facts stated in its petitions for reconsideration it was entitled to a hearing and to favorable action by the Commission. It invokes Sections 312(b), 303(f), 303(h), 309(a), 303(g), and 307(b) of the Communications Act, and § 3.24(b) of the Commission's Rules and Regulations, and the due process clause of the Fifth Amendment to the Constitution. We print in the margin the text of the sections and rule referred to.[4] American contends that the interference which will be suffered by KECA through the operation of KTHT under the

4. Sec. 303. Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

\* \* \*

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act: *Provided, however,* That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this Act will be more fully complied with;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

(h) Have authority to establish areas or zones to be served by any station; Sec. 307.

\* \* \*

(b) In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

Sec. 309. (a) If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the Commission upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe.

Sec. 312.

\* \* \*

(b) Any station license hereafter granted under the provisions of this Act or the construction permit required hereby and hereafter issued, may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this Act or of any treaty ratified by the United States will be more fully complied with: *Provided, however,* That no such order of modification shall become final until the holder of such outstanding license or permit shall have been notified in writing of the proposed action and the grounds or reasons therefor and shall have been given reasonable opportunity to show cause why such an order of modification should not issue.

§ 3.24 *Broadcast facilities; showing required.* An authorization for a new standard broadcast station or increase in facilities of an existing station will be issued only after a satisfactory showing has been made in regard to the following, among others:

\* \* \*

(b) That objectionable interference will not be caused to existing stations or that if interference will be caused the need for the proposed service outweighs

Commission's grant of August 21, 1947, is objectionable interference as defined by the Commission's Standards of Good Engineering Practice if within the service area, even though beyond the normally protected contour, of KECA. Texas Star and the Commission resist these contentions.

It is clear from the foregoing that in this appeal American attacks the action taken by the Commission on August 21, 1947, in its grant to Texas Star and on January 8, 1948, in its denial of American's petitions for reconsideration, and attacks also the Commission's manner of acting, *i. e.*, without affording American "an opportunity to be heard."

 With respect to the contention of American that it was improperly denied an opportunity to be heard: This contention is foreclosed by the decision of the Supreme Court in Federal Communications Commission v. WJR, The Goodwill Station, Inc., 337 U.S. 265, 69 S.Ct. 1097 (1949). In that case, as in the instant case, there was a petition by a broadcasting station licensee for reconsideration of a grant by the Commission, allegedly without hearing, to another station of facilities which it was asserted by the petitioner would cause objectionable interference beyond its normally protected contour. The petition in the WJR case invoked the provisions of both Section 312(b) of the Communications Act and the due process clause of the Fifth Amendment, as does American in the instant case. In the WJR case, as in the instant case, the denial of the petition for reconsideration was after its consideration on a written submission only, *i. e.*, without oral argument. The Supreme Court held that this was not an abuse of the Commission's discretion, that neither the due process clause of the Fifth Amendment nor Section 312(b) of the Communications Act, nor that portion of Section 4(j) of the Communications Act providing that ". . . Any party may appear before the Commission and be heard in person or by

attorney . . ." requires more than consideration on written submission. It is true that in the WJR case the issue before the Commission was one of law only arising from the allegations of the petition for reconsideration as if submitted on demurrer, whereas in the instant case, as appears from the statement above, American's petitions and the opposition of Texas Star presented issues of both law and fact. But the guarantee of hearing implied in the due process clause of the Fifth Amendment applies as well to a hearing on issues of fact as to hearings on issues of law. Therefore, the ruling of the Supreme Court must be held to extend to both.

 With respect to the contention of American that the action of the Commission on August 21, 1947, in its grant to Texas Star and on January 8, 1948, in its denial of American's petitions for reconsideration was incorrect: Preliminary to a discussion of this contention, it is to be observed that the Commission in its individual merit standard set forth above has, in effect, declared that it will determine, upon application of a station within one of the classes referred to in that standard for protection from interference to a contour within its service area, but beyond its normally protected contour, whether or not primary service to approximately 90% of the population (served with adequate signal) of the area between the normally protected contour and the contour to which the applicant station actually serves is supplied by any other station or stations carrying the same general program service. If the Commission determines that question in the affirmative, then under the individual merit standard, it has no further duty; that is to say, it will in such event not be obliged to exercise its discretion in respect of affording protection to the applicant station beyond its protected contour on the individual merits of the case. But if the Commission determines that question in the negative, then it has obliged itself by

the need for the service which will be lost by reason of such interference. That the proposed station will not suffer interference to such an extent that its service would be reduced to an unsatis-

factory degree. (For determining objectionable interference, see Engineering Standards of Allocation and Field Intensity Measurements in Allocation.)

virtue of the individual merit standard to consider the case of the applicant station upon its individual merits.[5] American's petitions for reconsideration in the instant case are in reality an application for favorable action by the Commission under the individual merit standard rather than petitions for reconsideration as such within the meaning of § 1.390 of the Commission's Rules and Regulations. In effect the petitions sought a modification of American's license by a grant of protection from interference to a contour within its service area but beyond its present normally protected contour. The Commission has, in its denial of American's petitions, determined the question posed by the individual merit standard in the affirmative. That is to say, it has decided that the primary service to approximately 90% of the population (served with adequate signal) of the area between the normally protected contour and the contour to which American's station KECA actually serves is supplied by other stations carrying the same general program service. This determination is critical so far as the interest of American, and indeed so far as the interest of the public, is concerned. For if the Commission's determination of the issue stated is correct, then American is not entitled to consideration on its individual merits of its application for protection from interference beyond its normally protected contour; and the public interest will be adequately served without that protection. But if the Commission's determination of the issue stated is incorrect, then the Commission would be under a duty, under its own declaration in the individual merit standard, to consider on its individual merits the application of American for protection within its service area beyond its normally protected contour. It is true that in considering an application on its individual merits the Commission would be acting only on a discretionary basis, but it would be obliged to exercise its discretion according to fair and legal considerations, and its exercise of discretion would be reviewable for abuse.

 Section 402(b) (2) of the Communications Act permits an appeal from a decision of the Commission by any person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing an application for modification of an existing radio station license. If the Commission incorrectly determined as against American the issue posed by the individual merit standard, American is a person aggrieved or whose interests are adversely affected by the Commission's decision because as a result it has been denied consideration on its individual merits of its application for protection within its service area beyond its normally protected contour and has thereby been denied consideration of what in effect was an application for modification of its license. We will therefore on a proper record be obliged to review the correctness of the determination of the Commission that the primary service rendered by American to approximately 90% of the population (served with adequate signal) of the area between American's normally protected contour and the contour to which it actually serves is supplied by other stations carrying the same general program service. In reviewing decisions of the Commission, we are limited to "questions affecting constitutional power, statutory authority and the basic prerequisites of proof." Rochester Telephone Corporation v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). In this appeal we are concerned only with a question affecting one of the basic prerequisites of proof, to wit, whether or not there was substantial evidence to support the determination of the Commission.[6]

5. In its Introduction to its Standards of Good Engineering Practice Concerning Standard Broadcast Stations the Commission states that the Rules and Regulations contain references to the standards, but that as further standards may be issued after the Rules and Regulations are published, the absence of such references shall not relieve the responsibility of meeting the requirements specified in the standards. The Commission is bound by the standards, as well as are station licensees.

6. Section 402 (e) of the Communications Act provides ". . . That the review by the court shall be limited to questions

■ But we think that we cannot properly decide upon the present record the question of the correctness of the Commission's determination of the critical issue stated, since in the Commission's memorandum opinion and order there is set forth only its ultimate finding of fact on that issue, and there is lacking any statement of the basic or underlying facts and a statement of the evidence upon which such facts may be based. The finding of the Commission was as follows:

> In the instant case the area receiving primary service from KECA outside of its 2.5 mv/m contour receives, as petitioner itself alleges, service from six other stations; KFI, KNX, KLAC and KMPC in Los Angeles, KPMO, Pomona, and KVVC, Ventura, all in California. Of these, KFI is affiliated with the National Broadcasting Company and KNX with the Columbia Broadcasting System. KNX and KFI serve all the present interference free area of KECA, and approximately 30% of the area receives additional primary service from one or more of the other stations. Since none of the six stations is affiliated with the American Broadcasting Company, few if any of the specific programs broadcast by KECA are duplicated in the area. However, while petitioner has enumerated a lengthy list of programs devoted to special events, public service and cultural broadcasts which it carries, analysis of such programs do not reveal any types of programs broadcast by KECA and not carried by the other stations. In fact KNX and KFI, both of which cover the entire area under discussion, are stations affiliated, as is KECA, with national networks, and carrying the same general types of programs—a service devoted partly to the programs of the national network, commercial and sustaining, entertainment, special events, public service and the like and partly to local and regional programs emanating from and of special interest to the Los Angeles and Southern California regions.

■ On an appeal to this court under Section 402(b) of the Communications Act, it is the duty of the Commission, as provided in Section 402(c), to "file with the court the originals or certified copies of all papers and evidence presented to it upon the application or order involved, and also a like copy of its decision thereon, and . . . a full statement in writing of the facts and grounds for its decision as found and given by it . . . ." Moreover, in a succession of judicial decisions it has been pointed out that the process which the Commission properly follows in reaching a decision includes the taking and weighing of evidence, a determination from attentive consideration of this evidence of facts of a basic or underlying nature, a determination by rational inference from these basic facts of the ultimate facts in the case, and finally, an announcement of the decision of the Commission by application of the statutory criterion. It has been pointed out further that when a decision is accompanied by proper findings of fact, the reviewing court can decide whether the decision reached by the Commission follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have any substantial support in the evidence; but that in the absence of proper findings of fact, the reviewing tribunal can determine neither of these things. It has been made abundantly clear that the Commission must find not merely the ultimate facts but in addition the basic or underlying facts, and that the court examines the evidence not itself to make a finding for the Commission of either the basic or the ultimate facts but to ascertain whether or not the basic facts are properly supported. See on these topics the following: Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. 282, 96 F.2d 554 (1938); Tri-State Broadcasting Co., Inc., v. Federal Communications Commission, 68 App.D.C. 292, 96 F.2d 564 (1938); Johnston Broadcasting Co. v. Federal Communications Commission, 85 U.S.App.D. C. ——, 175 F.2d 351 (1949); Easton Publishing Company v. Federal Communications Commission, 85 U.S.App.D.C. ——, 175 F.2d 344 (1949); and see especially also Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931), and United States v. Chicago, M., St. Paul & Pacific R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935), cited and discussed in the Saginaw Broadcasting case.

■ The finding of fact made by the Commission set forth above, that the program service of KECA and the program

---

of law and that findings of fact by the Commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear that the findings of the Commission are arbitrary or capricious. . . ."

service of the other stations mentioned as rendering primary service in the area beyond the protected contour of KECA are of the same general character, is a finding of ultimate fact only. The Commission made no finding of basic or underlying facts, *i. e.*, of what the program service of each of the several stations actually is. Obviously we cannot decide whether the ultimate finding—that the program service rendered by KECA is of the same general character as the program service rendered by the other stations—is rationally drawn from a comparison of the program service of each of the stations with that of the others unless we are informed what the program service of each station is. It is true that there is set forth in American's petition for reconsideration a purported description of the program service of KECA, and it appears that there is no dispute as to the correctness of that description. But there is no authentication of this by a finding of the Commission. And there is no statement anywhere in the record, either in the form of a Commission's finding or otherwise, as to what the program service of the other stations actually is. Moreover, the Commission did not, as required by the statute, file with the court the originals or certified copies of all papers and evidence presented to it. Not until this has been done and the basic facts as to the nature of the program service of each of the stations are found shall we be able to decide whether or not those facts have substantial support in the evidence. While the decision of the Supreme Court in the WJR case held, as above pointed out, that the Commission may act upon written submission, *i. e.*, without oral argument, we do not understand the ambit of that decision to be so broad as to relieve the Commission from the duty of receiving evidence and of making findings of both the basic or underlying and the ultimate facts before it decides an issue of fact presented by a petition and an opposition thereto.

The case is accordingly remanded to the Commission with directions to file with the court, in accordance with the provisions of Section 402(c) of the Communications Act and the requirements laid down by the courts in the cases above cited, the originals or certified copies of all papers and evidence presented to it and a full statement in writing of the facts and grounds for its decision.[7]

Remanded for further proceedings.

7. It is to be noted that in the foregoing opinion we discuss only the questions whether there was improper denial to American of an opportunity to be heard and whether on the present record we can determine the correctness of the Commission's ultimate finding of fact. The questions raised by American's petitions and Texas Star's opposition, *i. e.*, the questions whether the proposed operation of KTHT would cause the loss of listeners to KECA asserted by American, whether the interference to be occasioned would lie in the general Los Angeles area or otherwise, and whether the directional antenna system proposed by American for KTHT would seriously limit the latter station's service in the Houston metropolitan area, require additional land, assertedly unobtainable even at an increased price, and require added expense for towers with phasing equipment, will be before the Commission itself for decision only if, upon a return of the case to this court, after the present remand, accompanied by copies of the papers and evidence presented to the Commission and with proper findings of fact, we should reach the conclusion that there was no substantial evidence to support the ultimate finding of the Commission that the program service of KECA and° of the other stations in the area in question is of the same general character, and therefore return the case to the Commission for action by it under its individual merit standard on the individual merits of American's application for protection beyond its normally protected contour.