**UNITED STATES of America,**
**Appellee,**

v.

**Clark Eugene HEFFNER, Appellant.**

**No. 13114.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 10, 1969.

Decided Dec. 30, 1969.

Dissenting Opinion Jan. 6, 1970.

---

Thomas Ward, Baltimore, Md. (Court-appointed counsel) for appellant.

Barnet D. Skolnik, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., and Clarence E. Goetz, Asst. U. S. Atty., on brief) for appellee.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

Defendant was convicted of two counts of wilfully furnishing to his employer, in Baltimore, Maryland, false and fraudulent statements of federal income tax withholding exemptions, contrary to 26 U.S.C.A. § 7205. He was convicted on each count, and sentenced to consecutive one-year terms of imprisonment, with eligibility for release at any time the Board of Parole might determine, pursuant to 18 U.S.C.A. § 4208(a) (2).

Defendant assails his convictions, *inter alia*, upon the ground that they were obtained in part by the use of statements which had been obtained from him without compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 799 (1966). *Cf.* United States v. Dickerson, 413 F.2d 1111 (7 Cir. 1969). We need not decide that issue, however, for we perceive a narrower ground which requires reversal.

There is no dispute about the events which led to defendant's convictions. Sometime during the late 1950's the ownership of certain business and residential property shifted from the defendant to other persons. Defendant believed that the transfer was unlawful and that he was the rightful owner. This uneducated and emotionally disturbed man was sincerely convinced that the loss of his properties was the result of a conspiracy between a former business associate and various state and local officials.

For several years defendant attempted to secure the help of the state and federal governments in regaining his property. When these efforts proved unavailing, he determined to use the novel device of refusing to pay federal income taxes as a means of prodding the government into taking some action with respect to his grievance. His decision was implemented by his claiming a ridiculously large number of exemptions on the Withholding Exemption Certificate (Form W-4) which he was required to file with his employer. Thus, although entitled to only two exemptions, defendant claimed eleven in 1965 and twenty in 1966. In order to insure that the significance of this action was not missed, he wrote to the Internal Revenue Service (IRS) to notify them of his action and the reason for it.

Although his previous attempts to communicate with the government had gone without reply, this action evoked a reponse from IRS. Sometime in early 1967, Special Agents of the Intelligence Division of the IRS made a preliminary investigation, which disclosed that defendant was not entitled to the number of exemptions which he had claimed. The agents then arranged for an interview with defendant at a local IRS office.

Defendant appeared voluntarily, without counsel, on February 19, 1967. He was advised by the agents that he was not required to furnish any information which might tend to incriminate him, and that anything he said could be used against him. Defendant, however, was not warned that the function of Special Agents of the Intelligence Division was to investigate the possibility of a criminal prosecution for tax fraud. Nor was he advised that he could retain counsel to assist him in the interview. There followed a question-and-answer interview which was recorded and subsequently transcribed. In this interview defendant seriously incriminated himself.

There followed a delay of over nine months. Then, on November 30, 1967, defendant was again invited to the IRS local office. Again, however, he was neither warned of the purpose of the investigation nor advised that he could retain counsel. Upon request, he signed a transcribed version of the interview of the previous February.

Over timely objection, the Special Agent's testimony concerning defendant's incriminating statements in the February interview was admitted at trial. We hold that this was reversible error.

On October 3, 1967, the IRS issued instructions to all Special Agents of the Intelligence Division. These instructions were reported in "IRS News Release No. 897, Oct. 3, 1967," reprinted in 7 CCH 1967 Stand.Fed.Tax Rep. § 6832:

> "In response to a number of inquiries, the Internal Revenue Service today described its procedure for protecting the Constitutional rights of persons suspected of criminal tax fraud, during all phases of its investigations.

> "Investigation of suspected criminal tax fraud is conducted by Special Agents of the IRS Intelligence Division. This function differs from the work of Revenue Agents and Tax Technicians who examine returns to determine the correct tax liability.

> "Instructions issued to IRS Special Agents go beyond most legal require-

ments to assure that persons are advised of their Constitutional rights.

> "On initial contact with a taxpayer, IRS Special Agents are *instructed* to produce their credentials and state: '*As a special agent, I have the function of investigating the possibility of criminal tax fraud.*'

> "If the potential criminal aspects of the matter are not resolved by preliminary inquiries and further investigation becomes necessary, the Special Agent is *required* to advise the taxpayer of his Constitutional rights to remain silent and to *retain counsel.*

> *       *       *       *       *       *

> "IRS said although many Special Agents had in the past advised *persons, not in custody,* of their privilege to remain silent and retain counsel, the recently adopted procedures *insure uniformity in protecting the Constitutional rights of all persons.*" (emphasis supplied.)

Thus, voluntarily, IRS took upon itself the obligation to give taxpayers, before interrogation, notice that they were suspected of criminal tax fraud and the further obligation to give the full *Miranda* warnings before seeking incriminating statements.

The November 30 interview with defendant occurred almost two months after these instructions had been announced. Yet in two particulars the Special Agent failed to comply with them. First, he never warned the defendant that "[a]s a special agent, I have the function of investigating the possibility of criminal tax fraud." Second, the defendant was never advised that he could "retain counsel."

█ An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down. This doctrine was announced in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). There, the Supreme Court vacated a deportation order of the Board

of Immigration because the procedure leading to the order did not conform to the relevant regulations. The failure of the Board and of the Department of Justice to follow their own established procedures was held a violation of due process. The *Accardi* doctrine was subsequently applied by the Supreme Court in Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959), and Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), to vacate the discharges of government employees. See also Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963). And the *Accardi* doctrine has been utilized by the courts of appeal. *E. g.,* United States ex rel. Brooks v. Clifford, 409 F.2d 700, 706 (4 Cir.), rehearing denied, 412 F.2d 1137 (4 Cir. 1969); Hammond v. Lenfest, 398 F.2d 705, 715 (2 Cir.), vacated on rehearing on other grounds, 398 F.2d 718 (2 Cir. 1968); Pacific Molasses Co. v. FTC, 356 F.2d 386, 389–390 (5 Cir. 1966); Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221, 224–225 (1959).

■ It is of no significance that the procedures or instructions which the IRS has established are more generous than the Constitution requires. In Service v. Dulles, *supra,* the Supreme Court vitiated the discharge of a foreign service officer because of the State Department's failure to follow its own procedures. The Court concluded that it made no difference that the State Department had no statutory or constitutional obligation to establish the procedure in question:

> While it is of course true that * * * the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, * * * having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them.

354 U.S. at 388, 77 S.Ct. at 1165. See also Vitarelli v. Seaton, *supra.*

Nor does it matter that these IRS instructions to Special Agents were not promulgated in something formally labeled a "Regulation" or adopted with strict regard to the Administrative Procedure Act; the *Accardi* doctrine has a broader sweep. The Supreme Court in Vitarelli v. Seaton, *supra,* applied it to a Department of the Interior "Order." The Second Circuit has applied it to the Army's "Weekly Bulletin 42," § 4(c) (Oct. 20, 1967). Smith v. Resor, 406 F.2d 141, 143–144 & n. 2, 146 (2 Cir. 1969). The District of Columbia Circuit has applied the doctrine to a FCC "rule" which had not been formally promulgated but which the court found had been established by the FCC's "usual practice" of including the rule in its orders. Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 269 F.2d 221, 224–225 & nn. 8 & 9 (1959). See also McKay v. Wahlenmaier, 226 F.2d 35, 43 (D.C. Cir. 1955) (alternative holding). The same court has also applied the doctrine to FCC "Standards." American Broadcasting Co., Inc. v. FCC, 85 U.S.App.D.C. 343, 179 F.2d 437, 442–443 (1949). Finally, in United States ex rel. Brooks v. Clifford, 409 F.2d at 706, this court applied the doctrine to a Department of Defense "Directive."

These cases are consistent with the doctrine's purpose to prevent the arbitrariness which is inherently characteristic of an agency's violation of its own procedures. As the Second Circuit said in Hammond v. Lenfest, 398 F.2d at 715, cited with approval in United States ex rel. Brooks v. Clifford, 409 F.2d at 706, departures from an agency's procedures "cannot be reconciled with the fundamental principle that ours is a government of laws, not men." The arbitrary character of such a departure is in no way ameliorated by the fact that the ignored procedure was enunciated as an instruction in a "News Release." The document purports to establish certain procedures which Special Agents are "required" to follow. Undoubtedly, a failure to comply is a rare event within the Intelligence Division—a fact which highlights the apparently inadvertent failure to give the required warnings here. Fur-

thermore, a reversal here would not only have the salutary effect of encouraging IRS agents to observe their own procedures, L. Jaffe, Judicial Control of Administrative Action 369 (1965), cited with approval in Smith v. Resor, 406 F.2d at 146, but would assist the IRS in fulfilling its own important stated purpose in requiring that the warnings be given. For the announcement of the instructions was coupled with the justification that they would insure *"uniformity* in protecting the Constitutional rights of all persons."

■ The *Accardi* doctrine furthermore requires reversal irrespective of whether a new trial will produce the same verdict.* In both Yellin v. United States, 374 U.S. at 121, 83 S.Ct. 1828, 10 L.Ed.2d 778, and *Accardi* itself, 347 U.S. at 268, 74 S.Ct. 499, 98 L.Ed. 681, the Supreme Court vacated government actions and remanded for new determinations consistent with the established procedures even though the Court doubted that these procedures would lead to a different result. Even though it was unlikely that the appellant would prevail on remand, the Court held that he "should at least have the chance given him by the regulations." Yellin v. United States, 374 U.S. at 121, 83 S.Ct. at 1836.

It matters not that part of the interrogation which produced defendant's admissions occurred in February before the IRS instructions were promulgated. As the IRS News Release stated, the purpose of the instruction was to "insure uniformity" in protecting all persons from unknowledgeable relinquishment of their rights. The obligation to fulfill this purpose by giving the *Miranda* warnings arose on November 30 when defendant was asked to sign the written transcript—and thus to create indisputable proof—of his previous damaging admissions. If given the warnings, perhaps defendant would have decided to sign without the advice of counsel. An equal possibility is that defendant, alerted to the prosecutorial purpose of the interview, would have requested counsel. In either event the uniformity which the IRS sought would have been achieved.

Finally, it also matters not that at trial the government offered testimony which dealt solely with the February 19 interview without formal introduction of the signed statement into evidence. A copy of the statement was in the agent's hands during the entirety of his testimony. The trial judge referred to it as a "statement" and indicated in the jury's presence that it had been signed. Although the agent did not read the admissions verbatim from the statement on direct examination, he did read whole paragraphs verbatim from the statement on preliminary matters before recounting the defendant's incriminating utterances. Furthermore, the Assistant United States Attorney three times referred to the defendant's "statement" in his closing argument to the jury. Probably, from these incidents of the trial, the jury knew that there existed a signed, written confession.

■ If the jury had any doubt of this, it was allayed by cross-examination, for defense counsel brought out that the statement had been signed on November 30 and had the agent read the entire statement to the jury. This, however, constituted no waiver of defendant's rights; nor did it render the error harmless. Given the fact that the government had utilized the statement to incriminate the defendant, defense counsel had no choice but to pursue the strategy which he adopted. He attempted to press the

---

* We need not assume that the United States Attorney will elect to try defendant again. Defendant began service of sentence on August 26, 1968, and he will have served more than sixteen months of this total sentences of two years by the date of this decision. In view of the time served, the mental and emotional condition of defendant, and his apparent purpose to protest what seemed to him injustice rather than actually to succeed in obtaining exemptions to which he was not entitled, this may be a case in which the government concludes to dismiss the indictment.

defense that defendant was justified in claiming an excessive number of exemptions by his sincere belief that he had been the victim of injustice. Since the statement contained many things not brought out by the government on direct examination which supported this justification, defense counsel was impelled to bring them out on cross-examination. Under the circumstances of this case, the conclusion is inescapable that counsel had no other viable choice. Thus, even with defendant's acquiescence, he cannot be said *voluntarily* to have waived a known right; nor is he chargeable with any responsibility for adding prejudice to defendant's case.

Reversed and remanded.

ALBERT V. BRYAN, Circuit Judge, (dissenting):

I cannot concur in the opinion of the majority because the ground for the reversal is, in my view, entirely unsound in the circumstances of this case. It was not even suggested in brief or oral argument. On the facts here I do not think the authorities cited require that the judgment of the District Court be overturned.

I would simply add these observations. In my judgment the prosecution was not only justified but compelled. There was a flouting of the law that gave the Government no choice, unless it was to allow every taxpayer the same privilege. The Internal Revenue agents extended him every possible consideration. His statements to them were made without importunity by word, surroundings or otherwise. The District Judge with apprehension and caution inquired into the appellant's mental condition. Psychiatrical scrutiny was pursued, and evidence on this concern was finely sieved by the judge before concluding that the appellant was fully competent in mind.

For all of these reasons I feel I must record my dissent.