## MASSACHUSETTS FAIR SHARE, Petitioner,

v.

## LAW ENFORCEMENT ASSISTANCE ADMINISTRATION, Respondent.

### No. 84–1037.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 24, 1985.

Decided April 2, 1985.

As Amended April 8, 1985.

Richard M. Bank, Washington, D.C., for petitioner.

Daniel Bensing, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Mark H. Gallant, Atty. Dept. of Justice, were on the brief, for respondent. Edward R. Cohen and Robert S. Greenspan, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent.

Before ROBINSON, Chief Judge, and WRIGHT and EDWARDS, Circuit Judges.

Opinion for the Court filed by Chief Judge, SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

Petitioner, Massachusetts Fair Share, challenges a decision of the Administrator of the Law Enforcement Assistance Administration (LEAA)[1] purporting to deny peti-

---

1. LEAA was established in 1968 as a unit within the Department of Justice. Pub.L. No. 90–351,

tioner's application for a grant under the Urban Crime Prevention Program.[2] Noting that the program is structured for joint management by LEAA and the Agency for Voluntary Service (ACTION),[3] and that the application had previously been conditionally approved by both agencies, petitioner contends that the Administrator lacked power to reject the application unilaterally. We agree, and accordingly reverse.

## I

The Urban Crime Prevention Program was created by LEAA and ACTION in 1978 responsively to a presidential call for a new initiative in the crusade against crime.[4] The program was designed to draw upon "ACTION's special experience in volunteerism and community organization ... in conjunction with the LEAA's decade of expertise in the field of crime prevention," [5] and envisioned five to fifteen grants for pilot field projects.[6] Program strategy, goals, and a plan for implementation were set forth in a memorandum of agreement between the two agencies.[7] The agreement

emphasized the cooperative nature of the program, and provided for joint development of guidelines and internal procedures and for joint evaluation of applications for grants.[8]

As contemplated by the agreement, the program was announced in the Federal Register in early 1980.[9] The announcement discussed various program features,[10] specified eligibility requirements and listed sixteen selection criteria.[11] Prospective applicants were referred to the program's guideline manual,[12] which gave further details on the program and prescribed the procedures for processing applications.

In response, a large number of applications for grants were received, including one from petitioner. Its application sought funding for its Boston Arson Prevention Project, "a comprehensive program operated through 10 neighborhood organization[s] under the administration of funds by [petitioner]." [13] Along with the others, the application went through the selection methodology delineated in a "decision memorandum." [14]

tit. 1, § 101, 82 Stat. 198 (1968) (codified as amended at 42 U.S.C. § 3711 (1982)). On April 15, 1982, all programs and staff of LEAA were transferred to the Department's Office of Justice Assistance, Research, and Statistics. 47 Fed. Reg. 16,694 (1982). This transfer did not, however, "result in an impoundment of any funds or in the termination of any function required by statute to be carried out under [LEAA's] authorizing legislation." *Id.* at 16,695. In the interest of simplicity, we will refer, as the litigants have, to LEAA rather than its statutory successor.

2. *Massachusetts Fair Share v. Law Enforcement Assistance Admin.* (Dept. of Justice, Dec. 27, 1983), (decision of Administrator), reproduced in Record Excerpts (R.E.) 1 [hereinafter cited as *Decision of Administrator*]. Our jurisdiction to review this decision is derived from 42 U.S.C. § 3785(a) (1982).

3. ACTION is an independent executive agency. 42 U.S.C. § 5041 (1982).

4. Department of Justice, Urban Crime Prevention Program Guideline Manual iii (1980) (preface) [hereinafter cited as Guideline Manual].

5. *Id.* at iv (introduction).

6. LEAA/ACTION Memorandum of Agreement for Urban Crime Prevention Program (Dec. 29,

1978) at 1, 4, reproduced in R.E. 32, 35 [hereinafter cited as Memorandum of Agreement]. When the program was publicly announced, it proposed funding of these projects to a maximum of $500,000 each. 45 Fed.Reg. 7601, 7603 (1980).

7. Memorandum of Agreement, *supra* note 6, R.E. 32.

8. *Id.* at 3, R.E. 34.

9. 45 Fed.Reg. 7601 (1980).

10. *Id.* at 7602–7604.

11. *Id.* at 7606.

12. *Id.* at 7601, 7602. See note 4 *supra*.

13. Stipulated Statement of Facts (filed Feb. 17, 1982) ¶ 18 at 6, reproduced in R.E. 19 (quoting MFS's application) [hereinafter cited as Stipulated Statement].

14. Decision Memorandum: Competitive Categorical Grant Application Review Process for the Urban Crime Prevention Program (UCPP) (May 15, 1980), partially reproduced in R.E. 38 [hereinafter cited as Decision Memorandum].

The first step in the selection process was a review to determine whether the application contained all required attachments.[15] Petitioner's application was found acceptable on that score and thus eligible to continue in the evaluation process.[16] Next, a panel of LEAA and ACTION personnel examined the eligible applications for compliance with the selection criteria.[17] Applications were scored and the top thirty in rank order became "semifinalists" for grants.[18] Two additional staff members, one each from LEAA and ACTION, then evaluated the semifinalists' applications, and petitioner's proposal was ranked fifteenth.[19] Comments on the thirty semifinalists were solicited from many sources, and staff members made site visits to their projects.[20]

Ultimately, LEAA's Administrator and ACTION's Director jointly selected petitioner, as one of eleven "finalists," "for funding under the Urban Crime Prevention Program initiative, contingent upon successful resolution of remaining minor programmatic and financial issues."[21] The staff was instructed to "proceed to negotiate with the [ ] prospective grantees in order to finalize the formal award documents for [the agency heads'] signatures."[22]

Notwithstanding this determination, LEAA officials continued to investigate petitioner's proposal.[23] Without ACTION's participation, LEAA personnel contacted City of Boston officials,[24] and LEAA officials enlisted the help of an LEAA attorney, not previously involved in the program, who conducted a separate review of the selection process.[25] Nearly three months after the selection of finalists, ACTION's Director requested LEAA's Administrator to execute documents formalizing a grant to petitioner in conformity with their joint decision.[26] Instead, LEAA's Administrator composed a letter to petitioner proclaiming a denial of its application on six grounds.[27] LEAA sent the letter to ACTION's Director prior to mailing, but he refused to sign it.[28]

Petitioner filed an administrative protest and hearings were subsequently conducted. The hearing officer held that LEAA's action in "unilaterally rejecting [petitioner's] application is contrary to the memorandum of agreement requiring joint action, and is void on its face independent of reasons for rejection offered in the letter of rejec-

15. *Id.* at 5.

16. Stipulated Statement, *supra* note 13, ¶ 25 at 7, R.E. 20.

17. Decision Memorandum, *supra* note 14, at 4–5, R.E. 38–39.

18. *Id.* at 6, R.E. 40.

19. Stipulated Statement, *supra* note 13, ¶¶ 29–31 at 8, R.E. 21.

20. *Id.* ¶¶ 32–35 at 8–9, R.E. 21–22.

21. Designation of UCPP Grant Finalists (Sept. 19, 22, 1980), reproduced in R.E. 45.

22. *Id.*

23. See Brief for Petitioner at 18–22; Brief for Respondent at 7–9.

24. Stipulated Statement, *supra* note 13, ¶¶ 38–49 at 10–15, R.E. 23–28; *Massachusetts Fair Share v. Law Enforcement Assistance Admin.* (Dept. of Justice, July 13, 1983) (hearing determination)

at 2 (statement of facts ¶ 8), reproduced in R.E. 6 [hereinafter cited as *Hearing Determination*].

25. Stipulated Statement, *supra* note 13, ¶ 40 at 11, R.E. 24; Brief for Respondent at 7–8.

26. Stipulated Statement, *supra* note 13, ¶ 45 at 13, R.E. 26.

27. The six grounds asserted were (1) lack of partnership between petitioner and the City of Boston; (2) an award to petitioner would not further the program's goal of "insur[ing] maximum geographic distribution of funding;" (3) petitioner's project ranked lower than other projects that were denied funding; (4) petitioner's application did not adequately meet the program's "common characteristics;" (5) public-sector organizations were not sufficiently involved in the planning of that application, and (6) the application lacked the best available and most recent crime statistics. *Id.* ¶ 55 at 17–18, R.E. 30–31.

28. *Id.*

tion."[29] The hearing officer further held that none of the six reasons proffered in the letter of rejection could withstand either a substantial-evidence test or an arbitrary-or-capricious standard.[30] These determinations were reviewed by a Department of Justice administrator[31] who, without addressing the validity of LEAA's unilateral rejection at all, concluded that "facts existed to support each of the six bases for denial [of the grant] at the time the denial decision was made."[32] On this premise, the Justice administrator ruled that "[petitioner's] grant rejection was fully justified," and denied petitioner's protest.[33] The administrative process thus exhausted, petitioner brought the controversy here.

## II

We perceive a need to consider only the question whether the procedures established for administration of the Urban Crime Prevention Program foreclosed unilateral action by LEAA's Administrator. Since we answer in the affirmative, we do not reach the further question whether the grounds advanced in LEAA's rejection letter could in any event support a refusal of a grant to petitioner.

■ It has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated.[34] This precept is rooted in the concept of fair play and in abhorrence of unjust discrimination,[35] and its ambit is not limited to rules attaining the status of formal regulations. The Supreme Court has declared that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures,"[36] even though the procedural requirement there spoken of had not been published in the Federal Register,[37] and other courts have concluded similarly.[38] The highly-refined procedures for treat-

29. *Hearing Determination, supra* note 24, at 8–9 (conclusions of law ¶ 5), R.E. 12–13.

30. *Id.* at 9 (conclusions of law ¶ 9), R.E. 13.

31. LEAA's administrative review procedure is prescribed by 28 C.F.R. §§ 18.1–18.80 (1984).

32. *Decision of Administrator, supra* note 2, at 1, R.E. 1.

33. *Id.* at 3, R.E. 3.

34. *United States v. Nixon,* 418 U.S. 683, 694–696, 94 S.Ct. 3090, 3100–3101, 41 L.Ed.2d 1039, 1056–1057 (1974); *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403, 1418 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 266–267, 74 S.Ct. 499, 502–503, 98 L.Ed. 681, 686–687 (1954); *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n,* 218 U.S.App.D.C. 134, 145, 673 F.2d 525, 536, *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *Panhandle Eastern Pipe Line Co. v. FERC,* 198 U.S.App. D.C. 387, 402, 613 F.2d 1120, 1135 (1979), *cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980); *VanderMolen v. Stetson,* 187 U.S. App.D.C. 183, 190, 571 F.2d 617, 624 (1977).

35. See *International House v. NLRB,* 676 F.2d 906, 912 (2d Cir.1982); *United States v. Heffner,* 420 F.2d 809, 812 (4th Cir.1969); *NLRB v. Welcome-American Fertilizer Co.,* 443 F.2d 19, 20 (9th Cir.1971).

36. *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270, 294 (1974). Ruiz, a Papago Indian, left his reservation in Arizona to live in an Indian community a short distance away. The Bureau of Indian Affairs denied him general assistance under the Snyder Act, 25 U.S.C. § 13 (1982), when a strike shut down the mine at which Ruiz had been employed. The denial was based on a provision in the agency's manual restricting eligibility to Indians living "on reservations" or in jurisdictions under Bureau authority in Alaska and Oklahoma. The manual also stated, however, that all directives informing the public of benefits available and eligibility requirements were to be published in the Federal Register and codified in 25 C.F.R. 415 U.S. at 233–235, 94 S.Ct. at 1073–1074, 39 L.Ed.2d at 293–294. Holding that publication and codification thus became necessary of the requirement that an Indian in Arizona must reside directly "on" a reservation in order to qualify for general assistance—steps that had not been taken—the Court declared that "[b]efore the BIA may extinguish the entitlement of these otherwise eligible beneficiaries, it must comply, at a minimum, with its own internal procedures." *Id.* at 235, 94 S.Ct. at 1074, 39 L.Ed.2d at 294.

37. 415 U.S. at 234, 94 S.Ct. at 1074, 39 L.Ed.2d at 293. See also 5 U.S.C. § 552(a)(1) (1982).

38. *Mazaleski v. Treusdell,* 183 U.S.App.D.C. 182, 198–199 n. 38, 562 F.2d 701, 717–718 n. 38 (1977) (provisions in agency personnel manual); *Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 33–34, 269 F.2d 221,

ment of applications for grants under the Urban Crime Prevention Program—procedures jointly formulated, publicized and instituted by LEAA and ACTION in a statutorily-sanctioned cooperative endeavor [39]—command the same respect.

■ Each basic document pertaining to the program contemplated joint decisionmaking by LEAA and ACTION. The memorandum of agreement by which they gave birth to the program aptly described it as a "joint effort." [40] The program was to be staffed by an equal number of employees from each agency.[41] Coordination between the two agencies was to occur, at a minimum, through "joint development and publication of guidelines, internal procedures, monitoring, evaluation and technical assistance plans," and, as well, by joint selection of projects to be funded and joint awards of ensuing grants.[42] Staff members were instructed to "accentuate the joint nature of the program and avoid situations that give the appearance of one agency having lead responsibility for the program." [43] The Federal Register notice announcing the program characterized it as "jointly developed and administered" by LEAA and ACTION,[44] and the decision memorandum described a selection methodology assigning equal roles to the two agencies.[45] Last, but certainly not least, was the guideline manual's notification to applicants that the

"Director of ACTION and the Administrator of LEAA will approve or disapprove application[s]." [46]

We find in these documents no source of authority for separate disposition of grant applications by either agency, nor does LEAA argue to the contrary. Rather, its sole position, as it ultimately developed,[47] is that no final decision to fund petitioner's project ever eventuated. To be sure, consummation of the agencies' joint award to petitioner was "contingent upon successful resolution of remaining minor programmatic and financial issues," [48] but that did not enable either agency to abrogate unilaterally the decision they had achieved in concert. Put another way, neither agency, proceeding alone, could withdraw the conditional grant simply because petitioner had to meet the stated conditions in order to receive it. The power to revoke, no less than the power to grant, was subject to the requirement of joint agency action.

The decision under review is reversed, and the case is remanded for further proceedings consistent with this opinion.[49]

*So ordered.*

---

224–225 (1959) (agency's "usual practice"); *Smith v. Resor,* 406 F.2d 141, 143–144 & n. 2 (2d Cir.1969) (regulations set forth in agency weekly bulletin); *United States v. Heffner, supra* note 35, 420 F.2d at 811–812 (instructions to special agents reported in agency news release). See also *Doe v. Hampton,* 184 U.S.App.D.C. 373, 388–390, 566 F.2d 265, 280–282 (1977) (remanding for determination of whether guidelines in Federal Personnel Manual were mandatory or precatory).

**39.** LEAA is authorized to utilize available services and personnel of another federal agency. 42 U.S.C. § 3789 (1982). ACTION has power to contract with other federal agencies for assignment of volunteers. *Id.* § 5042(12).

**40.** Memorandum of Agreement, *supra* note 6, at 1, R.E. 32.

**41.** *Id.* at 2, R.E. 33.

**42.** *Id.* at 3–4, R.E. 34–35.

**43.** *Id.* at 5, R.E. 36.

**44.** 45 Fed.Reg. 7601 (1980).

**45.** Decision Memorandum, *supra* note 14, at 4–7, R.E. 38–41.

**46.** Guideline Manual, *supra* note 4, at 46 (emphasis omitted).

**47.** LEAA claimed in its brief, Brief for Respondent at 21–22, that under 42 U.S.C. § 3765 (1982) it had residual power to annul the joint decision of LEAA and ACTION in petitioner's favor. Since, however, LEAA abandoned that contention at oral argument before us, we do not consider it.

**48.** See text *supra* at note 21.

**49.** Our remand is to the Office of Justice Assistance, Research, and Statistics of the Department of Justice. See note 1 *supra*.