William E. RILEY, Special Agent, Intelligence Division, Internal Revenue Service, Petitioner,

v.

Bernard G. McGARRY, Claire M. Harrington, Lawrence F. O'Donnell, and John B. Greene, Respondents.

Civ. A. No. 65–671.

United States District Court
D. Massachusetts.

Jan. 5, 1966.

W. Arthur Garrity, Jr., U. S. Atty., Edward F. Harrington, Asst. U. S. Atty., Boston, Mass., for plaintiffs.

Lawrence F. O'Donnell, John B. Greene, Boston, Mass., for respondents.

Mitchell G. Hadge, Boston, Mass., for O'Donnell.

JULIAN, District Judge.

This is a petition for civil contempt.

William E. Riley, special agent, Intelligence Division, Internal Revenue Service, brings this action to have the respondents adjudged in contempt of court for wilfully disobeying the Court's order to produce for examination certain books and records by removing them from the office of the Internal Revenue Service knowing that the examination had not been completed. The petitioner prays that the respondents be ordered to return the books and records to the Internal Revenue Service so that the examination may be completed, and for other relief.

The case was tried by the Court sitting without a jury.

### FINDINGS OF FACT

On March 19, 1964, three summonses were issued by the Internal Revenue Service under authority of 26 U.S.C. § 7602 in connection with an investigation of the tax liability of respondent Bernard G. McGarry, and of Marie G. McGarry. They were directed respectively to "McGarry's, Inc., Claire M. Harrington, President and Treasurer," "J. E. Poor Co., Inc., Claire M. Harrington, Treasurer," and "Ye Olde Brown Jug, Inc., Bernard G. McGarry, Treasurer." The individuals Harrington and McGarry are named as respondents in this case. Bernard G. McGarry is also the taxpayer whose tax liability was under investigation. In each instance the summons was served on the named corporate officer and required each to appear before the petitioner at a stated time and place to give testimony relating to the tax liability of Bernard G. and Marie G. McGarry and to bring and produce "for examination" the corporate records for the years 1952 through 1961.

The records called for were not produced and the legality of the summonses was challenged before the hearing officer. Petitions for the enforcement of the summonses were filed on July 15, 1964. Judge Wyzanski ordered the summonses enforced on September 18, 1964. The Court of Appeals for the First Circuit affirmed the judgment of Judge Wyzanski on May 3, 1965.[1] A petition

---

1. McGarry's, Inc. v. Rose, 1965, 1 Cir., 344 F.2d 416.

for a stay pending application for a writ of certiorari was denied by Mr. Justice Goldberg on June 3, 1965. Since a stay of compliance no longer existed, Judge Wyzanski, on June 29, 1965, entered a new order enforcing the summonses. The order commanded respondents Harrington and McGarry, among others, to appear and produce before Special Agent Riley, the petitioner, on July 9, 1965, at 10 o'clock, A.M., "all those papers and records called for by the respective summonses enforced herein." [2] This is the order that the respondents in this case are alleged to have wilfully disobeyed.

Pursuant to the order, the respondents McGarry and Harrington, on July 9, 1965, appeared before special agent Riley, the petitioner herein, and produced the records involved in the instant case. The respondents McGarry and Harrington were accompanied by their counsel, the respondents O'Donnell and Greene. Agent Riley, in the presence of O'Donnell and Greene, informed McGarry and Harrington of Judge Wyzanski's order. Among the many statements made by O'Donnell to Riley in the course of the interrogation were the following:

" * * * I state the records which are now being produced will be for you to look at, we will stay with them and attempt to take them back. * * * "

* * * * * *

"In behalf of my client, no photostats are to. be made of these records."

* * * * * *

"Having in mind the Order of the Court, which states July 9, 1965, it doesn't state any other date, it would seem without taking a re-

stricted reading of the Order, your examination is today, period."

* * * * * *

" * * * As far as we are concerned we will be present during the examination, we will repossess ourselves when your examination is temporarily or finally concluded with a view to having a reasonable statement made as to the length of time of the examination when you reach a point where you can make such a forecast."

* * * * * *

" * * * I object to any photostats of any sort being made of these records. * * * As I say, the order is for you to look at them."

Neither Riley nor any other agent agreed with the respondents that no photostats were to be made of the records. Production of the records was not accepted on that condition. Riley did enter into an arrangement with O'Donnell and Greene whereby the records would not be examined except in the presence of either attorney or some other person authorized by them. It was also agreed that at the conclusion of each day's examination the records would be placed in boxes and that these would be sealed and kept in a locked room until the examination was to be resumed. The seals would then be broken in the presence of the respondents' representative and the examination continued. No substantial reason for respondents' insistence on this procedure appears in the evidence. Riley assented to it solely because O'Donnell insisted on it. Riley deemed it expedient to accept this arrangement so as to avoid further controversy with O'Donnell and possible resulting delays.

---

2. The order reads as follows: "It appearing to the Court that the order previously entered herein on September 18, 1964 was stayed pending appeal, and it further appearing that the judgment of this Court was affirmed by the Court of Appeals for the First Circuit (No. 6420, May 3, 1965), that these cases were remanded to this Court on May 18, 1965 by the Court of Appeals, and that there is no longer stay of compliance with the judgment of enforcement herein; it is ORDERED that the respondents and each of them appear and produce before Special Agent William E. Riley at Room 946, 55 Tremont Street, Boston, Massachusetts, on the 9th day of July, 1965, at 10 o'clock A.M., all those papers and records called for by the respective summonses enforced herein."

The examination began on July 9, 1965, the same day on which the voluminous records were produced. Because of limited manpower only one revenue agent, Roberson, was assigned to the work. The respondent Greene was present during the examination. Agent Roberson spent the first four days making a complete inventory of all the records produced in response to the summonses.

The following is a chronological history of the examination:

July 9, 12, 13, and 14.—Agent Roberson made an inventory of the records.

July 15 and 16.—Agent Roberson examined the records of Ye Olde Brown Jug, Inc.

July 19, 20, and 21.—Examination was suspended at respondent Greene's request because respondent O'Donnell had been summoned to appear before the Senate Judiciary Committee in Washington, D. C.

July 22, 23, 26, 28, 29, and 30 (half day).—Examination continued.

July 27.—Examination was suspended at Greene's request because he was otherwise engaged.

July 30.—Examination was suspended for a half day because agent Roberson was engaged in another case.

August 2, 3, 4, 5, and 6.—Agent Robertson was on vacation. No examination.

August 9, 10, 11, 12, and 13.—Examination was suspended at Greene's request so that he might attend a convention in Florida.

August 16, 17, 18, 19, and 20 (Friday).—No examination. Neither O'Donnell, Greene, nor anyone representing the respondents appeared. The seals on the boxes containing the records were not broken.

August 23 (Monday).—Respondents O'Donnell and Greene appeared, took all the records away and never returned.

There were 31 business days from July 9 to August 20, both dates included. Out of these 31 days agent Roberson worked 11½ days on the records. On 19½ days no work was done on the records. On 5½ of these 19½ days no work was done because an agent was not available. On 14 of the 19½ days, work on the records was suspended either at the request of respondent Greene or because of the failure of both O'Donnell and Greene to appear at the place where the records were to be examined.

Because the examination of the records was not proceeding with sufficient speed, Riley informed Greene on Monday morning, August 16, that on each day thereafter the examination would begin at 8:30 a. m. and continue until 5 p. m., and that some of the records would be photographed. Greene told Riley that no photostats were to be made, that O'Donnell had forbidden it, and that if photostats were made, the records would be taken away. Riley warned Greene that if he picked up the records, he, Greene, "would be in bad shape."

Greene requested and was granted time to consult with O'Donnell. He returned and told Riley that O'Donnell would not permit the records to be photographed. Greene then stated that he would not break the seals on the boxes containing the records and left the office. Neither Greene nor O'Donnell showed up for the rest of the week.

On August 19, Riley informed Greene by telephone that the examination would be resumed on Monday morning at 8:30 a. m., that such records as were deemed necessary would be photographed, that the agents would be instructed accordingly, and that Greene could be present if he wished. Two additional revenue agents were assigned to examine the records.

On Monday August 23, at about 8:30 a. m., special agents Riley and Rose, three revenue agents, and respondents O'Donnell and Greene were present in

the room where the examination was to be resumed.

██ Rose introduced O'Donnell and Greene to the two additional revenue agents who had been assigned to examine the records and told O'Donnell and Greene that he had brought in the two additional agents in order to move the examination along and complete the audit. At O'Donnell's request all the boxes containing the records were brought into the room and placed on a table. O'Donnell thereupon threw his brief case on top of the boxes and said, "I now have possession of these records and I am taking them out of here." Agent Roberson told O'Donnell that they were not through examining them. O'Donnell said that he was taking them out anyway and made a statement (Exh.K) giving, in substance, two reasons for taking the records away, (1) that the agents had no right to photostat the records, and (2) that they had already been given a reasonable amount of time to complete the examination. I find that these reasons were spurious and mere pretexts for the removal of the records. I find that the real reason for the withdrawal of the records was to prevent the completion of the examination and to impede and obstruct the investigation of the respondent McGarry's tax liability.

At the conclusion of the statement, O'Donnell and Greene physically picked up the boxes containing the records and carried them out of the building.

██ None of the respondents except Greene took the stand at the hearing. Greene testified that it was his "feeling" that the examination of the records had been completed. I find, however, that when O'Donnell and Greene took the rec-

ords away from the agents they both knew that the examination had not been completed, and that they both had full knowledge of the contents of the Court order of June 29, 1965, and of the contents of the summonses to which the order related.

The sealed boxes containing the records were taken to O'Donnell's office where they were kept unopened until they were delivered by agreement of the parties to the Clerk of this Court on September 28, 1965.

At no time after the Court issued its order of June 29, 1965, did O'Donnell or Greene seek a modification of the order or an opinion of the Court as to respondents' right to take away and withhold the records from the Internal Revenue Service before their examination had been completed.[3]

Agent Riley's purpose in wanting to photostat some of the records was to expedite the examination. Agent Roberson had been transcribing records in long hand. This procedure was too slow and was delaying the examination.

██ There is no essential difference between copying a document in long hand and making a photostatic copy of it. The latter method is generally faster and more accurate. The evidence does not show that O'Donnell or any of the other respondents had ever objected to the making of hand-written copies of the records.

At his appearance before Riley on the morning of July 9, 1965, O'Donnell attempted to read limitations and restrictions into the order of enforcement which were designed and intended to hamper the examination of the records. I find that O'Donnell's objection to the photo-

---

3. "THE COURT. * * * If there was doubt in your mind as to whether or not the Internal Revenue Service had the right to retain these records beyond August 23, why didn't you bring the matter to the attention of the Court that issued the order?

"MR. O'DONNELL. First of all, the Judge in that instance signed his last

order saying that he didn't want this matter * * * brought before him again.

"THE COURT. Yes. But you do have a Judge * * * who is assigned as an emergency Judge each month of the year.

"MR. O'DONNELL. I appreciate that and I will answer your Honor this way: that was a strategical judgment for me to make. * * *" (Transcript of Trial, pp. 140–141)

stating of the records was arbitrary and was interposed solely for the purpose of delaying, impeding, and obstructing the examination of the records and, consequently, the investigation of McGarry's tax liability.

■ I find that because of limitations of manpower and the prolonged interruptions in the examination of the records caused by the respondents O'Donnell and Greene themselves, the Internal Revenue Service, as of August 23, 1965, had not had the records under examination for an unreasonable length of time. The records, as the respondents knew, were voluminous. The respondents O'Donnell and Greene also knew on the morning of August 23, before they took the records away, that two additional revenue agents were on hand to expedite the examination. The records produced pursuant to the summonses, with the possible exception of a few that applied to the year 1962, related to 1961 and prior years. There were none for the years 1963, 1964, or 1965. None of the records produced were in current use or needed by any of the three corporations in the conduct of their businesses. There is nothing in the evidence to indicate that they were needed by the corporations or any of the respondents for any purpose. No claim is made, nor is there any intimation in the evidence, that retention of the records by the Internal Revenue Service for continued examination would have caused hardship or inconvenience to the corporations or any of the respondents. After the records were taken from the office of the Internal Revenue Service they were taken to the respondent O'Donnell's office where they remained unopened and unused until September 28, 1965, when, by agreement of the parties, they were delivered to the Clerk of this Court.

As of August 23, the approximate amount of time needed by one agent to complete the examination was as follows:

1) Five more days for the records of Ye Olde Brown Jug, Inc. Agent Roberson had already examined a substantial quantity of these records.

2) Twenty days for the records of McGarry's, Inc.

3) Thirty days for the records of J. E. Poor Co., Inc.

The records of the three corporations were being examined to determine the correctness of the returns and the tax liability of the respondent McGarry who was the individual under investigation. The corporations themselves were not under investigation.

■■ An investigation into the tax liability of a taxpayer may potentially have a dual purpose. One is to determine whether a return filed by the taxpayer is correct. It is the function of the revenue agents to make a complete audit and to gather the necessary information to enable them and their superiors to determine whether or not the return is correct and whether or not a tax is owed by the taxpayer. If it appears that the return is incorrect and that a tax is owed, the investigation may be pursued further to determine whether or not the return is fraudulent and whether or not there was a wilful attempt on the part of the taxpayer to evade taxes. This latter aspect of the investigation is handled by special agents in the Intelligence Division of the Internal Revenue Service, assisted by revenue agents working under their supervision. The ultimate purpose of this second aspect of the investigation is to determine whether or not criminal prosecution of the taxpayer should be recommended by the special agent to his superiors. These, in turn, at various levels in the Internal Revenue Service organization decide whether the case should be processed civilly or be forwarded to the Department of Justice with a recommendation for criminal prosecution. The final decision whether the taxpayer should be prosecuted criminally and the case presented to a grand jury is made by the Department of Justice. The civil and criminal aspects of a tax investigation are factually interrelated at the investigatory stage, since the existence and extent of a civil tax liability, or its nonexistence, must be determined in any event. The investigation in such

a case is in fact a joint investigation by special and revenue agents who as a practical matter must work in cooperation with one another if the investigation is to be conducted efficiently.

Special agents Riley and Rose, revenue agent Roberson, and, in the week preceding August 23, two other revenue agents, were assigned to the investigation of respondent McGarry's tax liability.

In January, 1965, Riley recommended criminal prosecution in the case of the respondent McGarry. At the time of the trial of this case the recommendation was pending in the Department of Justice. The Department has taken no action on the recommendation.

The investigation into respondent McGarry's civil tax liability has not been concluded. It was interrupted by the litigation begun by the respondents McGarry and Harrington, among others, attacking the validity of the summonses, and by the subsequent removal of the records by respondents O'Donnell and Greene.

■ I find that respondents O'Donnell and Greene took away and withheld the records from the agents of the Internal Revenue Service with intent to prevent their examination and to obstruct and defeat the order of enforcement entered by the Court on June 29, 1965. The ultimate purpose of their action was to delay, impede, and obstruct the investigation by the Internal Revenue Service into the tax liability of their client, the respondent McGarry.

I find that the respondents O'Donnell and Greene knowingly and intentionally violated the order entered by Judge Wyzanski on June 29, 1965.

The evidence before me is insufficient to warrant a finding that either the respondent Harrington or the respondent McGarry knew of the intention of O'Donnell and Greene to take away and withhold the records from the Internal Revenue Service, or that they authorized such action, or that they knew that the examination of the records had not been completed.[4]

At the conclusion of the trial it was agreed by the parties that all the records taken by respondents O'Donnell and Greene from the offices of the Internal Revenue Service would be delivered that same day to the Clerk of this Court for safekeeping until further order of the Court.[5]

## CONCLUSIONS OF LAW

Title 26 U.S.C. § 7602 authorizes an examination for the purpose of ascertaining the correctness of any return, determining the liability of any person for any internal revenue tax, or collecting any such liability. It also authorizes the examination of books, papers, records or other data which may be relevant or material to such inquiry.

■ The reason for the issuance of the three summonses in this case was to ascertain the correctness of the respondent McGarry's tax returns and to determine his tax liability. The possibility that the examination of the records of the three corporations may also disclose evidence that might lead to McGarry's criminal prosecution does not render the examination of the records unlawful. In re Magnus, Mabee & Reynard, Inc., 1962, 2 Cir., 311 F.2d 12, cert. den., 373 U.S. 902, 83 S.Ct. 1289, 10 L.Ed.2d 198; Boren v. Tucker, 1957, 9 Cir., 239 F.2d 767; see also Lash v. Nighosian, 1959, 1 Cir., 273 F.2d 185, 188.

■ The right to examine records in the course of an investigation includes the right to use means that will enable the examiner to make a full, accurate,

4. "THE COURT. Is there anything in the exhibits now before me which you contend constitutes authority to you to go and take possession of records which did not belong to you?

"MR. O'DONNELL. No, your Honor. Only on the fact that I was acting as a lawyer in behalf of my client. * * * I did not consult with him [McGarry] for his opinion * * * nor did I consult with Claire Harrington." (Transcript, pp. 139–140)

5. I have been informed by the Clerk's office that this was done.

and speedy examination and to prepare a dependable report of his findings. The agents of the Internal Revenue Service in this case had the right to photograph the records produced pursuant to the summonses. Boren v. Tucker, 1957, 9 Cir., 239 F.2d 767, 771; Westside Ford, Inc. v. United States, 1953, 9 Cir., 206 F.2d 627, 634; see also Wirtz v. Local No. 502, 1962, D.N.J., 217 F.Supp. 155.

The validity of the summonses involved in this case, and the order of the District Court entered on September 18, 1964, directing their enforcement were upheld by the Court of Appeals in McGarry's, Inc. v. Rose, 1965, 1 Cir., 344 F.2d 416.[6]

The order entered by Judge Wyzanski on June 29, 1965, directing the enforcement of the same summonses was valid, has never been modified, and has remained in full force and effect since the date it was entered.

Neither respondent O'Donnell nor respondent Greene had the right to take away and withhold the records from the Internal Revenue Service before the examination had been completed. Such removal and withholding was wholly without legal justification. Respondents' reliance on Reisman v. Caplin, 1964, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459, to justify the removal and withholding of the records is wholly without merit.

 The conduct of respondents O'Donnell and Greene constituted contempt of court. This contempt persisted from August 23, 1965, until September 28, 1965, when the records were delivered to the Clerk of this Court.

I find the respondents O'Donnell and Greene guilty of civil contempt of court.

I find the respondents McGarry and Harrington not guilty.

Since the present action is one for civil contempt, the question of whether or not the respondents are guilty of crim-

inal contempt is not before me and is not decided.

The records having been voluntarily delivered to the Clerk of the Court, there is no need to coerce the respondents by imprisonment or fines to return the records to the Internal Revenue Service for examination.

 The Government has neither claimed nor proved damages. Therefore, no fine will be imposed on the respondents O'Donnell and Greene to reimburse the Government for any loss.

The petitioner, however, is entitled to relief.

It is ordered that the Clerk of this Court turn over forthwith to the petitioner as special agent in the Intelligence Division of the Internal Revenue Service, or other duly authorized agent of said Service, all of the records heretofore delivered to the Clerk by the respondents or any of them; that the Internal Revenue Service shall retain possession of all such records until it shall have completed examining them; that such examination shall be completed within forty-five days (exclusive of Saturdays, Sundays, and legal holidays) after the Clerk has turned over the records as above ordered; that the respondents and each of them be and they are hereby enjoined from interfering in any way with the possession, custody, and examination of said records by the Internal Revenue Service or its authorized agents; that the Internal Revenue Service or its authorized agents may photograph the records or portions of them in order to facilitate their full, complete, and accurate examination; that the word "records" as used in this order shall be construed to include all of the books, records, and papers covered by the three summonses served on the respondents Harrington and McGarry, namely, the summonses received in evidence at the trial as Exhibits A, B, and C.

6. One of the contentions raised in that case and disposed of by the District Court, and by the Court of Appeals, adversely to the appellants was the following: "that the required production might tend to incriminate the appellants in violation of the Fifth Amendment."