**UNITED STATES of America**
**v.**
**Anthony H. MACIEL.**
**UNITED STATES of America**
**v.**
**Anthony H. MACIEL, as President of East Providence Ambulance Co., Inc.**
**Nos. 7786, 7787.**

United States District Court,
D. Rhode Island.
Nov. 22, 1972.

Lincoln C. Almond, U. S. Atty., Providence, R. I., for plaintiff.

Milton Stanzler, Providence, R. I., for defendant.

## MEMORANDUM OPINION

PETTINE, Chief Judge.

Indictments for violation of 26 U.S.C. § 7201 were returned against the defendant, one in his individual capacity

and the other as President of East Providence Ambulance Co., Inc. His motions to dismiss pursuant to Rule 12(b)(1) and (2), Fed.R.Crim.P. are treated as motions for the suppression of evidence.[1]

The matter was referred to a magistrate pursuant to 28 U.S.C. § 636(b) and after an evidentiary hearing, an order was entered on October 10, 1972.[2] The defendant, not having waived an appeal, duly filed written objections to the magistrate's report in accordance with Local Rule 32, thus placing the matter before me for a review hearing as the judge to whom the case is assigned.

The defendant seeks to suppress all documents, books, papers, bank statements, check stubs, cancelled checks, and any and all other tangible objects as well as the use of any information resulting therefrom contending the same were obtained by Special Agents, Intelligence Division, Internal Revenue Service in violation of the Fifth Amendment of the United States Constitution.[3]

*Findings of Fact*

On December 2, 1968, the Internal Revenue Service contacted the defendant to audit the records of the East Providence Ambulance Co., Inc. Though the facts are not precise in spelling out the stock structure of the company, it is quite conclusive it is a closed entity with stock ownership entirely controlled and owned by the defendant and his wife.

Personal and corporate records as requested by the agent were voluntarily made available after obtaining the defendant's permission. The government did not indicate there were any criminal implications until February 18, 1969 when another agent of the Intelligence Division met with the defendant's accountant, Mr. John Mello. The agent, Mr. Robert Gray, though known to the accountant as such, did not identify himself as a criminal investigator nor did he give any advice or warning as to the purpose of his visit. On February 19, 1969, Mr. Gray requested and obtained from Mr. Mello, as permitted by his client, the personal and corporate documents for the years 1965, 1966 and 1967.

Mr. Gray's first meeting with the defendant was on March 5, 1969 and though the testimony is in conflict, this Court finds Mr. Gray did warn the defendant that an investigation was being conducted by the Intelligence Division which was charged with the responsibility of conducting examinations for possible criminal violations of the Internal Revenue laws and that he had a right to remain silent and to counsel. Significantly, I also find there were no warnings of the inculpatory possibilities of produced records or of anything the taxpayer might say as a tax violator suspect, or that he could not be compelled to incriminate himself by producing any documents or information.

1. In the light of defendant's written argument in support of his motions to dismiss the indictments, it appeared to the Court that said motions should be treated as motions to suppress evidence and it was so ordered. Memorandum and Order of April 4, 1972.

2. It is recognized that given the mandate of Rule 41(e) for motions to suppress based on a claim of illegal search and seizure to be heard only by the district court (see Note (e) of the Advisory Committee), such an assignment to the magistrate is questionable. In the instant case there was not an iota of evidence to support the defendant's Fourth Amendment claim. There is thus room for debate as to whether a hearing on a

motion to suppress based on a violation of a Fifth Amendment privilege can be heard initially by a magistrate. Since I am hearing the motion to suppress de novo, the propriety of such an assignment to the magistrate is a moot issue which I do not have to face.

3. In defendant's motions to dismiss pursuant to Rule 12(b)(1) and (2), Fourth and Sixth Amendment violations were also alleged. I do not reach these contentions, as I find no evidence whatsoever of an illegal search and seizure, and clear and convincing evidence that the defendant was adequately warned of his right to counsel. See Findings of Fact, *infra*.

Subsequent to this March 5, 1969 meeting, the case was assigned to another agent who readily testified he gave no warnings to the defendant since he relied on the purported one given by his predecessor. Indeed, I further find he advised the defendant he did not need a lawyer and boldly ill advised, "Attorneys get an arm and a leg."

The evidence further shows, and I so find, that subsequent to February 18, 1969, personal and corporate records were delivered to agents of the Internal Revenue Service as they requested and question and answer conferences were held with the defendant.

Finally on October 21, 1970, the Internal Revenue Service notified the defendant in writing that he was personally, and as President of East Providence Ambulance Co., Inc., a prime tax evader candidate.

### Conclusions of Law

The failure of Special Agent Gray to effectively warn the taxpayer that anything he said or the records he volunteered could be used to incriminate him, and that he could not be compelled to inculpate himself by producing any documents is a substantial violation of the procedures for advising taxpayers of their rights established by the Internal Revenue Service in News Release IR–949 of November 26, 1968. Such public release provides:

"One function of a Special Agent is to investigate possible criminal violations of Internal Revenue laws. At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding."

The situation before me is thus totally unlike that presented the court in United States v. Bembridge, 458 F.2d 1262 (1st Cir. 1972) where the agent was in complete compliance with the latest Service directive, though he omitted a warning required in a prior directive and instead substituted a broader and perhaps more effective warning as recommended in the most recent Service promulgation.

The present case does not involve the omission of any "magic words," but concerns instead, the agent's negligence in failing to advise the taxpayer of crucial rights. A taxpayer may well be cooperative in his answers and in his ready consent to inspection of his records when he is not aware that such evidence as is gathered may be used to incriminate him. Furthermore, the failure to advise the taxpayer that the production of possibly incriminating records could not be compelled is, in itself, a grievous breach of Internal Revenue Service standards of conduct. Written records are to a tax investigation what an oral confession is to a typical police interrogation. And it is unlikely that the average layman would be cognizant of the attachment of the Fifth Amendment privilege to personal records.

Adding insult to injury is the fact that any chance that the prolonged investigation would have awakened the taxpayer to the possible value of having the counsel of an attorney was effectively negated by Agent Hynes' breezy misinformation that counsel was unnecessary, that it would cost the taxpayer money to settle the case, and that "Attorneys get an arm and a leg."

█ I therefore find that the standard of behavior adopted by the Internal Revenue Service was sufficiently flaunted to bring the instant case into the scope of the doctrine of United States v. Leahey, 434 F.2d 7 (1st Cir. 1970). In the Leahey case, the Internal Revenue Service agents identified themselves but failed to advise the taxpayer that they

were investigating the possibility of criminal tax fraud.[4] The *Leahey* court found that such a disregard of publicly promulgated agency standards, though more expansive than what is constitutionally required, constitutes a violation of due process and necessitates the exclusion of evidence obtained in the tax investigation. The rationale of the court for a due process standard was twofold: first, the likelihood of the objective of uniform conduct by the agents would be much reduced (particularly in important cases) if the conduct of interviews did not effect the prosecution and would lead to the possible erosion of the citizens' faith in the even-handed administration of justice; secondly, the taxpayers and their counsel would have expectably and reasonably relied on the public pronouncement of the Internal Revenue Service. The above reasoning is equally applicable where the taxpayer is only partially informed of his rights. In fact, partial compliance which is substantially less than the agency requirements may lead to more confusion than complete disregard, for where a taxpayer is told he has the right to silence, and then is asked to produce records, a reasonable implication is that there is no constitutional privilege as to documents. The exclusionary rule established in *Leahey* therefore requires that I grant the motion to suppress as to personal records. It is so ordered.

The novel issue which is presented in this case is whether the corporate records volunteered to the Special Agents can similarly be excluded. This motion must be and is hereby denied.

The corporate records delivered to the Internal Revenue Service were those of East Providence Ambulance Co., Inc., wholly owned by Mr. Maciel; and Ma-

ciel Realty Co., whose sole shareholders are Mr. Maciel and his wife.[5] Though United States v. Bembridge, 458 F.2d 1262 (1st Cir. 1972) referred to personal corporate records, and held that the warnings given were in sufficient compliance with the Internal Revenue Service standards to warrant reversal of United States v. Bembridge, 335 F.Supp. 590 (D.C.Mass.1971) which had granted the motion to suppress, I do not find that either the district court or the reviewing court passed on any issue as to the exclusion of corporate records. The corporate records involved in *Bembridge* were those of a company in which the defendant was chief executive officer—a fact situation analogous to the instant case. However, the defendant moved only to suppress his personal papers (United States v. Bembridge, 335 F. Supp. 590). Thus, the First Circuit has never confronted the issue of whether "personal corporate records" are subject to the exclusionary rule.

As to this issue, the pivotal question is whether or not the directive at issue is applicable to corporate records. The nettling problem arises when there is a lack of an adequate pre-warning to the release of corporate records ultimately spawning an indictment against the taxpayer who then moves to suppress.

If adequately warned and the records are nevertheless released, there is no cause to complain. However, if after such warning there is a refusal, the Internal Revenue Service could then resort to 26 U.S.C. § 7602 and issue a subpoena duces tecum for the corporate records. The taxpayer being investigated has standing to challenge the summons or to intervene in a judicial enforcement proceeding if the summons is addressed to a third party only if there is a showing that a criminal charge is pending, or at

---

4. The Internal Revenue Service procedure at that time only required that on initial contact, the agent state, "As a special agent, I have the function of investigating the possibility of criminal tax fraud." A fuller rendition of rights was only required if, after preliminary inquiries,

further investigation was found necessary. United States v. Leahey, *supra*, at 9.

5. This information was derived from the exhibits, particularly Special Agent Gray's Report.

most that "[there is] an investigation solely for criminal purposes." Donaldson v. United States, 400 U.S. 517, 533, 91 S.Ct. 534, 544, 27 L.Ed.2d 580 (1970); see also Reisman v. Caplin, 375 U.S. 440 at 449, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); Boren v. Tucker, 239 F.2d 767, 772–773.

If such proceedings had been employed in the instant case, I would have found no evidence of the improper purpose of the gathering of evidence solely for use in a criminal prosecution. The taxpayer is asking for suppression of all records volunteered from February 19, 1969 when Special Agent Gray, who had criminal investigative functions, took over the case. The fact that such a Special Agent became involved in the study of taxpayer's records by no means implies the existence of the illegitimate purpose. Such a simplistic view was definitively rejected by the Supreme Court, which examined the criminal-civil hybrid nature of tax investigations:

> "We bear in mind that the Internal Revenue Service is organized to carry out the broad responsibilities of the Secretary of the Treasury under § 7801(a) of the 1954 Code for the administration and enforcement of the internal revenue laws. See Internal Revenue Service Organization and Functions, § 1112 et seq., 35 Fed.Reg. 2417 et seq. (1970). We further bear in mind that the Service has district offices, each with an audit division and a criminal division; that the Audit Division's program emphasizes the civil aspects of enforcement but embraces 'participation with special agents of the Intelligence Division in the conduct of tax fraud investigations,' § 1118.4; that the Intelligence Division enforces the criminal statutes affecting income and certain other taxes and develops information concerning alleged criminal violations, § 1118.6; that each assistant regional commissioner for intelligence develops programs for the investigation of alleged tax frauds and 'certain other civil and alleged criminal violations of

tax laws' and 'approves or disapproves recommendations for prosecution,' § 1114(10); and that recommendations for prosecution are processed through the office of regional counsel and by that office to the Department of Justice, § 1116(3). *This demonstrates that the special agent may well conduct his investigation jointly with an agent from the Audit Division; that their combined efforts are directed to both civil and criminal infractions; and that any decision to recommend prosecution comes only after the investigation is complete or is sufficiently far along to support appropriate conclusions. The fact that a full-scale tax fraud investigation is being made does not necessarily mean that prosecution ensues when tax liability becomes apparent."* (emphasis added)

*Donaldson, supra,* 400 U.S. at 534–535, 91 S.Ct. at 544. See also the lucid explanation of Judge Julian in Riley v. McGarry, 248 F.Supp. 545, 550–551 (D. C.Mass.1966).

As was noted in Boren v. Tucker, *supra,* 239 F.2d at 772, the possible resolutions of such an investigation include:

> "(1) civil liability for the correct tax, (2) liability for the tax plus penalty, (3) criminal prosecution, or (4) both the penalty and the criminal prosecution."

Further incontrovertible evidence of the complete absence of any improper purpose in the instant case is the fact that only one year and eight months after Special Agent Gray entered the investigation on February 19, 1969, did the Internal Revenue Service, in a letter dated October 21, 1970, notify the defendant that the agency was contemplating criminal proceedings against him personally and as the President of East Providence Ambulance Co., Inc. for corporate and personal income tax evasion. The letter indicates that even at that late date, an ultimate decision had not been made, for it invites the taxpayer to a meeting "before we make the final

decision." [6] I therefore find that the defendant would have lacked any grounds on which to challenge a summons, if instead of volunteering the records, he had awaited a production order addressed to himself or his accountant.

■ The one possible ground on which the corporate records may be excluded is if this Court reached the precedent-breaking conclusion that an individual's Fifth Amendment right against self-incrimination attaches to corporate records, when the corporation is closely held and family owned. All authority is to the contrary.

Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906) established that a corporation had no Fifth Amendment privilege against self-incrimination. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) decided that a corporate officer having custody of the corporate books cannot resist production pursuant to a subpoena duces tecum on the basis of his Fifth Amendment privilege. In Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913), the rationale of *Wilson* was applied to the sole shareholder of a corporation. Though the corpora-

tion had become defunct several years previous, the court held that whether or not the title had passed to the sole shareholder when the company had ceased, the essential character of the books had not changed and the constitutional privileges of the owner were not a bar to inspection.

The reasoning of these Supreme Court cases was reaffirmed in a more recent case, Curcio v. United States, 354 U.S. 118, 123, 124, 77 S.Ct. 1145 at 1149, 1 L.Ed.2d 1225 (1957) which reiterated the proposition that "a custodian, by assuming the duties of his office, undertakes the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers" although it also held that such an officer cannot be compelled "in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony."

The authority of these Supreme Court decisions has not been overruled by any circuit court. To the contrary, the above decisions have been relied on in Wild v. Brewer, 329 F.2d 924 (9th Cir. 1964), cert. den. 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 185 (1964) which held that the corporation's sole shareholder

6. The letter of October 21, 1970 follows:
"Dear Sir:
Investigation of the Federal Corporate Income tax returns of the East Providence Ambulance Co., Inc. for the years 1962 through 1968 indicates that a substantial amount of income for those years was not reported. We are, therefore, considering recommending criminal proceedings be instituted against you as President of East Providence Ambulance Co., Inc. for attempted evasion of the Corporate income tax for the years 1965 through 1968.
Investigation of your federal income tax returns for the years 1964 through 1968 indicates that a substantial amount of your income for those years was not reported. We are, therefore, considering that criminal proceedings be instituted against you for attempted income tax evasion for years 1965 through 1968.
Before we make a final decision, you may meet with us, if you wish, for an

interview concerning these matters. You may bring counsel with you or any persons who have knowledge of the facts in your case. During the interview, you may present any facts or evidence you would like us to consider. The interview will be conducted by Mr. Charles A. Harmon, Jr., Chief, Intelligence Division, at 2:00 P.M. on Wednesday, November 4, 1970, at the offices of the Intelligence Division, Internal Revenue Service, 130 Broadway, Providence, Rhode Island.
Please let us know whether you will attend. Your reply, or any questions you may have, should be addressed to the District Director, Internal Revenue Service, marked for the attention of the Chief, Intelligence Division, P.O. Box 6707, Providence, Rhode Island.
Sincerely yours,
Charles A. Harmon, Jr. /s
CHARLES A. HARMON, Jr.
Chief, Intelligence Division"

could not assert that the production of corporate records would tend to incriminate him (but see the excoriating dissent of Judge Madden); Hair Industry, Ltd. v. United States, 340 F.2d 510 (2d Cir. 1965) cert. den. 381 U.S. 950, 85 S. Ct. 1084, 14 L.Ed.2d 724 (1965), which denied the privilege of a sole shareholder to the records of his three corporations; and United States v. Bowman, 435 F.2d 467 (3d Cir. 1970) which sustained an order requiring the defendant, as President of a closely-held corporation, to produce corporate books.

I do recognize that in United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) where the issue was whether a union officer could be compelled to turn over union records pursuant to a subpoena duces tecum when he was alleging his Fifth Amendment privilege, the Supreme Court established the following guidelines:

"The test, rather, is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody the common or group interests only. If so, the privilege cannot be invoked on behalf of the organization or its representatives in their official capacity."

Id. at 1252

This test was applied in United States v. Silverstein, 210 F.Supp. 401 (S.D.N.Y. 1962) aff'd 314 F.2d 789 (1963), cert. den. 374 U.S. 807, 83 S.Ct. 1696, 10 L. Ed.2d 1031 (1963) which found that the privilege was not applicable to five large partnerships. However, I do not find that this test is applicable in this case as I conclude it applies only to non-corporate entities. In accord, Hair Industry, Ltd. v. United States, *supra*; United States v. Bowman, *supra*. In fact, United States v. White, *supra*, 64 S.Ct. at 1252 reaffirmed the precedent established in its court in the following comment:

"The fact that the state charters corporations and has visitorial powers over them provides a convenient vehicle for justification of governmental investigation of corporate books and records. Hale v. Henkel, *supra*; Wilson v. United States, *supra*. But the absence of that fact as to a particular type of organization does not lessen the public necessity for making reasonable regulations of its activities effective, nor does it confer upon such an organization the purely personal privilege against self-incrimination. Basically, the power to compel the production of the records of any organization, whether it be incorporated or not, arises out of the inherent and necessary power of the federal and state governments to enforce their laws, *with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records.*"
(emphasis added)

Premised on the rationale of such precedent, it seems to me it must be concluded the directive (*supra* at p. 819) does not apply in seeking corporate records. In the face of the overwhelming weight of authority, such a liberal intent by the Internal Revenue Service could only be demonstrated by clear and convincing language in the directive itself. The wording of the public release does not lend itself to such an interpretation:

". . . at the initial meeting with a *taxpayer* . . . advise the *taxpayer* that anything *he* says may be used *against him*. . . ."
(emphasis added)

In fact, the only logical interpretation of this language is that the directive is applicable only where there is an issue of personal tax liability.

Buttressing this construction is the introduction on constitutional rights im-

mediately preceding the Internal Revenue Service instructions on the procedures to be followed by Special Agents at interviews, set out in IR Manual MT —9300–26 at 9368 (10–21–68) (Official Use Only):

"(4) Violation of Rights—The Courts have long held that if an officer of the United States obtains evidence, a statement, or a confession of a crime from a *natural person* in violation of the above constitutional rights, such evidence, statement or confession, regardless of its import, shall not be admitted as evidence *against such person.*"

(emphasis added)

The directive itself and Fifth Amendment decisional law therefore mandate denial of defendant's motion to exclude the corporate records.