**UNITED STATES of America,
Plaintiff,**

v.

**Charles G. FUKUSHIMA, Defendant.**

**No. 73-13201.**

United States District Court,
D. Hawaii.

Feb. 26, 1974.

Harold M. Fong, U. S. Atty., Thomas P. Young, Asst. U. S. Atty., Honolulu, Hawaii, for plaintiff.

Arthur B. Reinwald, Anthony, Hoddick, Reinwald & O'Connor, Honolulu, Hawaii, for defendant.

## DECISION ON MOTION TO SUPPRESS OR TO DISMISS INDICTMENT

PENCE, Chief Judge.

Defendant is charged under a three-count indictment alleging that he filed false and fraudulent income tax returns for the years 1966, 1967 and 1968, in violation of Section 7201, Internal Revenue Code, 26 U.S.C. § 7201. The questions presented by defendant's motion are whether evidence obtained by means of personal interviews by IRS special agents with the defendant and examination of his financial records should be suppressed because of the claimed failure of IRS special agents to undeviatingly follow the published directives of their agency, and whether the indictment should be therefore dismissed.

As defendant in his reply memorandum on his motion to suppress indicates:

The sole question raised by the motion is whether the failure of the special agents to comply with [IRS] News Releases No. 897 and 949 violated defendant's constitutional rights. . . . The issue is the failure of the special agents to follow published procedures."[1]

### Published Procedures

On October 3, 1967, the IRS issued News Release No. 897, stating in pertinent part:

In response to a number of inquiries the Internal Revenue Service today described its procedures for protecting the Constitutional rights of persons suspected of criminal tax fraud, during all phases of its investigations.

.    .    .    .    .    .

On initial contact with a taxpayer, IRS Special Agents are instructed to produce their credentials and state: "As a special agent, I have the func-tion of investigating the possibility of criminal tax fraud."

If the potential criminal aspects of the matter are not resolved by preliminary inquiries and further investigation becomes necessary, the Special Agent is required to advise the taxpayer of his Constitutional rights to remain silent and to retain counsel.

.    .    .    .    .    .

. . . [These] procedures insure uniformity in protecting the Constitutional rights of all persons.

On November 26, 1968, the IRS issued News Release No. IR–949, stating in pertinent part:

[This] new procedure goes beyond most legal requirements that are designed to advise persons of their rights.

One function of a Special Agent is to investigate possible criminal violations of the Internal Revenue laws. At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding.

### Facts

The report of Special Agent Bigler concerning the crucial interview with the defendant, which was conducted by him and Special Agent Taylor, was as follows:

We arrived at the Federal Building about 3:30 p. m. FUKUSHIMA was advised that his tax returns for years 1965, 1966, 1967, and 1968 are under investigation. TAYLOR and I both showed him our badges and commis-

---

1. Defendant's Reply Memorandum, p. 2.

sions and I advised him that we were special agents with the Intelligence Division of the Internal Revenue Service and that as special agents, one of our duties is to determine whether or not false and fraudulent tax returns have been filed. I told him the fact that this is one of our duties and that we are investigating his tax returns does not mean that he did file false returns; that this will not be known until the investigation is completed. I told FUKUSHIMA that he could not be required to answer any questions or make any statements which would tend to incriminate him; that he could not be required to produce any books, or records, which might tend to incriminate him; and that it was his privilege to have an attorney present at any time he talked with the agents. I told him that with this understanding if he would now be willing to answer certain questions and discuss his tax affairs with us, we would like to do so. He agreed to do this.

Thereafter, the defendant made oral statements and supplied the business records, all of which are here sought to be suppressed.

With his motion, the defendant filed an affidavit stating that as of June 26, 1973, he was 64 years old, had an eighth grade education, practically all of his life had worked as a general helper or cook in small restaurants, and since 1941 had operated one or more restaurants in Honolulu. He had never had a tax investigation until 1970, when at the request of IRS agents he turned over to them his records concerning his 1965–68 tax returns. Two years later another IRS agent, Kelly, interviewed defendant in the IRS office on two occasions. Defendant states he did not realize that criminal charges were being prepared until he received a letter in April 1973 stating the charges.

Defendant's moving papers specifically negate any claim that the information

obtained from the defendant by the special agent was not voluntarily given, and also negate that there was any "fraud, trickery or deceit by the special agents."[2]

*Applicable Law*

Defendant's motion is basically founded upon the decisions of the Fourth Circuit Court in United States v. Heffner, 420 F.2d 809 (1970) and the First Circuit in United States v. Leahey, 434 F. 2d 7 (1970). In *Heffner,* that court reversed the tax fraud conviction of an "uneducated and emotionally disturbed man" because the agent had not warned defendant that the agent was investigating the possibility of *criminal* tax fraud, nor did the agent advise the defendant that he could retain counsel. 420 F.2d at 810. The court held that:

> An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down. This doctrine was announced in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 . . . (1954). . . .

> It is of no significance that the procedures or instructions which the IRS has established are more generous than the Constitution requires. 420 F.2d at 811–812.

*Heffner* well illustrates the axiom: hard cases make bad law. The majority there was justifiably concerned that the government should have ever prosecuted Heffner, and as indicated by the fact that they couched their reversal upon the authority of *Accardi, supra*; Service of Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959); and Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L. Ed.2d 1012 (1959),[3] went far out to uncover some sort of not-too-implausible authority upon which to peg their ultimate conclusion. This court, speaking more bluntly than the First Circuit did in *Leahey* concerning the authority un-

2. *Ibid.*

3. 420 F.2d at 811–812.

derlying *Heffner*, finds the three cases completely inapposite for the same reasons urged by the government in *Leahey*.[4]

As summarized by Judge Wyzanski in United States v. Bembridge, 335 F.Supp. 590 (D.Mass.1971), the *Leahey* ruling,

as a matter of the "due process" guaranteed by the Fifth Amendment, precludes the use in evidence, or as a lead to evidence, of records which a taxpayer surrenders upon demand to a Special Agent of the I.R.S. who is conducting a criminal tax fraud investigation of the taxpayer, but who, before demanding the documents, fails to state to the taxpayer the magic words, "As a special agent, I have the function of investigating the possibility of criminal tax fraud," which the October 3, 1967 News Release had directed all Special Agents to use in such circumstances. 335 F.Supp. at 591–592.

Judge Wyzanski continued:

In view of Judge Coffin's statement at p. 10 of 434 F.2d that *Leahey* stands for "a clear rule excluding admissions secured by an agent who has not conformed to required procedure," this court does not believe an inferior court can distinguish this case on the plausible ground that after hearing the evidence it is satisfied that defendant had the equivalent of the required warning. The judges of the Court of Appeals made it explicit that "such an approach would seem to us to invite uncertainty and litigation." 335 F.Supp. at 592.

As its verbose opinion indicates, the court in *Leahey* labored at length to find an acceptable rationale by which it could raise the failure of a special agent to follow the IRS guidelines to an invidious constitutional level. Included therein was a clear enlargement of The Court's "request" in Miranda v. Arizona, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), viz., that law enforcement agencies

develop better ways of harmonizing the protection of individual *rights* with the efficient enforcement of the law [emphasis added] . . . . . Were we to say that *Miranda* is the ceiling rather than the floor of the rights of citizens vis-a-vis the government, we would make a mockery of the *Miranda* invitation. 434 F.2d at 10.

The *Leahey* court's labored search for any foundation for its opinion is also illustrated by this:

When an agency "goes public" it does not do so lightly. Its obligations increase just as do those of a private corporation. *Ibid.*

And the *Leahey* court concluded:

Here, however, we have the two factors intersecting: (1) a general guideline, deliberately devised, aiming at accomplishing uniform conduct of officials which affects the post-offense conduct of citizens involved in a criminal investigation; and (2) an equally deliberate public announcement, made in response to inquiries, on which many taxpayers and their advisors could reasonably and expectably rely. Under these circumstances we hold that the agency had a duty to conform to its procedure, that citizens have a right to rely on conformance, and that the courts must enforce both the right and duty. 434 F.2d at 11.

It is not to be wondered at, therefore, that Judge Wyzanski made the observations quoted above. It is likewise not surprising that when considering *Bembridge* on appeal, 458 F.2d 1262 (1 Cir. 1972), the appellate court was compelled to circumscribe the broad sweep of *Leahey*, stating: "We are in complete agreement with [Judge Wyzanski's] . . . view that if *Leahey* mandates [recitation by an IRS agent of 'every syllable of a mumbo-jumbo formula']

4. 434 F.2d at 9.

. . . we have erred greviously." 458 F.2d at 1264. The *Bembridge* court then proceeded to distinguish *Leahey* on the basis that in *Leahey* the special agent gave "no warning whatsoever at a time when the 1967 press release with its precise formulation in terms of 'criminal tax fraud' was the latest applicable," *ibid*, whereas in *Bembridge* the agent conformed to the internally required procedure. The court then indicated a "disinclination to view an agency as irrevocably locked into the specific verbal formulation of a prior news release. . . ." *Ibid.*[5]

When the Rhode Island District Court was faced with the IRS procedural problem in United States v. Maciel, 351 F. Supp. 817 (1972), where the special agent did not warn the taxpayer that anything he said or the records he volunteered could be used to incriminate him and that he could not be compelled to incriminate himself by producing documents, that court concluded:

> The present case does not involve the omission of any "magic words," but concerns instead, the agent's negligence in failing to advise the taxpayer of crucial *rights*. (Emphasis added.) 351 F.Supp. at 819.

In United States v. Brod, 324 F.Supp. 800 (S.D.Texas 1971), the court observed that the IRS news release of October 3, 1967 was to insure uniformity in protecting the constitutional rights of all persons. The court stated:

> The taxpayer was not told of his right to retain counsel and remain silent until . . . after he had been interrogated by [a Special Agent] . . . on four previous occasions. The news release does not contemplate that the agent wait until he had enough information to convict before

he informs the taxpayer of his *rights*. . . . (Emphasis added.) 324 F. Supp. at 802.

Judge Suttle in United States v. Luna, 313 F.Supp. 1294 (W.D.Texas 1970) incisively dissected the fallacy underlying *Heffner* and *Leahey*:

> While the need to enforce rights granted by the Constitution and laws of the United States may outweigh the interests mitigating against the exclusion of otherwise admissible evidence, the enforcement of an agency policy statement does not, regardless of how desirable that policy might be. The Constitution and laws may of necessity dictate preconditions for the admissibility of evidence in a federal trial; administrative agencies may not. 313 F.Supp. at 1295.

In *Brod, supra*, Judge Singleton summarily disposed of *Luna* by transmuting the IRS directive into *new constitutional rights* for the taxpayer with this ipse dixit:

> The question is not one of what extent administrative agencies may bind the courts, but whether the court should exclude evidence so that agencies will follow the regulations they have formally and purposefully adopted in the light of the requirements of the Constitution, even though the regulations adopted go beyond what is mandatory under the Constitution. *Unquestionably*, there must be an affirmative answer to the latter question. (Emphasis added.) 324 F.Supp. at 803.

More "unquestionably", Judge Singleton's holding would penalize those law enforcement agencies who publish their instructions to their agents as to their investigative practices and procedures vis-a-vis those who do not.

Apparently overlooked by the courts in *Heffner* and *Leahey*, and not squarely

---

5. In note 1 of *Bembridge*, at 1264, counsel for the defendant argued that the earlier notice language of the IRS news release, "I have a function", together with reference to fraud has "an alerting potential" not present in reference to "criminal violations."

He cited as proof that when the special agent told his client he "was looking for tax fraud", he immediately consulted an attorney. *Cf.* the statement of Special Agent Bigler, *supra*.

recognized by the courts in any of the preceding cases, save *Luna,* is the fact that the IRS was concerned only with procedures for protecting the constitutional *rights* of persons as outlined by *Miranda, supra.*

In *Miranda,* the Court approvingly set forth the internal directives of the FBI on interrogation practices to be followed by its agents, as practices for emulation by state and local enforcement agencies. 384 U.S. at 484–486, 86 S.Ct. 1602. The standard FBI warnings, internally ordered before *Miranda,* included warnings to suspects of their right to say nothing, right to counsel, and that any statement might be used against the suspect. When the issue arose on pre-*Miranda* motions for suppression, not one of the cases cited in *Miranda; ibid,* involving the use of warnings, demanded that any ritual or magic words be used implementing the substance thereof.[6]

As pointed out in the *Miranda* dissent,[7] beginning in 1936 with Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, and continuing up to *Miranda* in 1966, in more than 30 full opinions of the Court, in testing admissibility of confessions by the Due Process Clause, "the Court never pinned it down to a single meaning but on the contrary infused it with a number of different values . . . . The outcome was a continuing re-evaluation on the facts of each case of *how much* pressure on the suspect was permissible." *Id.,* 384 U.S. at 507, 86 S.Ct. at 1645.

Congress itself, following the invitation of the *Miranda* court, in 1968 enacted 18 U.S.C. § 3501, setting forth the underlying factors surrounding the giving of a confession which the trial judge "shall take into consideration" in deciding upon the admissibility into evidence of confessions and concluded with the second paragraph of § 3501(b):

> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

Assuming *arguendo* that in the Ninth Circuit anything but short shrift could be given to the doctrine expounded by the *Heffner* and *Leahey* courts, any court that deigns to expand the constitutional rights enumerated by *Miranda,* when the one interrogated by an investigating law officer is *not* in custody, upon which "custody" *Miranda* as well as Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), are bottomed, should at least demand that substantial constitutional *rights* of a taxpayer have been invaded by the special agent in disregard of the published objective of the IRS.

■ This court certainly cannot elevate the failure of the special agent to use the magic word "criminal" before the words "false and fraudulent," when he advised the defendant of one of his duties, to the level of an invidious invasion of any constitutional right of the taxpayer.

In the Ninth Circuit, however, in United States v. Robson, 477 F.2d 13, 16 (1973), we find that court stating:

> This court has repeatedly refused to extend the *Miranda* rule beyond its stated limits. Simon v. United States, 421 F.2d 677 (9th Cir. 1970).

Even though that court thereafter considered the Fifth Amendment due process argument urged by the defendant, based upon the IRS News Release No.

---

6. The ritual and "magic words" argument in relation to the FBI Waiver of Rights Form was raised before and rejected by Judge Huyett in his well researched and reasoned decision of United States v. Young, 355 F. Supp. 103 (E.D.Pa.1973).

7. Justices Harlan, Stewart, White; Clark saying that the dissenters do "not go quite far enough." 384 U.S. at 494, 86 S.Ct. 1602.

**218**

897, it did so only on an "assuming *arguendo*" basis.[8]

■ As indicated above, this court can and does consider the IRS news releases to be an attempted administrative expansion of the *Miranda*-type warning problem into a non-custodial situation. Therefore, inasmuch as the Ninth Circuit has held as it did in *Robson,* where the Fifth Amendment due process problem was in a narrow sense before them, this court can only conclude that in the Ninth Circuit, absent deceit or overreaching, when agents of the Intelligence Division of IRS have properly identified themselves and disclosed their purpose to investigate tax returns, they are under no constitutionally mandated duty to advise the taxpayer of his Fifth Amendment rights or of the criminal nature of the investigation. That they might properly be internally disciplined by the IRS for bypassing any of its own specified procedures gives no legal comfort or rights to the taxpayer.

*Conclusions of Law*

■ To reiterate, not even under any of the authorities cited by the defendant can this court conclude that the failure on the part of the special agent to use the magic word "criminal" in stating the purpose of his investigation is a "substantial" deviation from the IRS procedures so as to permit this court to find that a constitutional right of the defendant has been encroached upon thereby. This court does not agree with *Heffner* or *Leahey,* or the circuit court in *Bembridge,* that the IRS publication of investigative procedures raises those procedures to the stature of constitutional rights under the due process clause of the Fifth Amendment. Moreover, even if it felt otherwise, this court believes that it would be constrained by the consistent opinions of the Ninth Circuit, as indicated by *Robson,* to hold that the IRS published procedures did not in the slightest erode or in any manner circumscribe the viability of the law on IRS non-custodial warnings, as set forth in *Robson.*

Defendant's motion to suppress and dismiss is denied.

---

8. Defendant also maintains that United States v. Campanella, (9 Cir., 72–1792, Nov. 1, 1973), sustains his position wherein the court said:

Next, appellant complains that Miranda-type warnings were not given as required by IRS regulations published in a news release. Those warnings were designed to be given to taxpayers when they are investigated for possible tax fraud. Appellant was not a taxpayer but one who prepared tax returns for others. Here the incriminating information was obtained from the persons whose returns appellant had fraudulently prepared, and not from appellant. United States v. Heffner, 420 F.2d 809 (4th Cir. 1969), is not in point. Slip op. at 3.

This precisely correct statement of the intent of the IRS internal procedure does not in the slightest, however, indicate the legal consequences that were expected or intended by the IRS to follow from the non-observance thereof by the IRS agents. As indicated from the quotation above, the problem presented to this court was not before the appellate court.